UNITED STATES, Appellee,

v.

Tommy R. QUIGLEY, Specialist
U.S. Army, Appellant.

No. 66,848.

CM 9002706.

U.S. Court of Military Appeals.

Argued May 6, 1992.

Decided Sept. 25, 1992.

For Appellant: *Dan R. Hyatt* (argued); *Major Michael J. Kelleher* and *Captain Holly K. Desmarais* (on brief).

For Appellee: *Captain Marcus A. Brinks* (argued); *Colonel Dayton M. Cramer, Lieutenant Colonel Daniel J. Dell'Orto, Major Joseph C. Swetnam* (on brief).

Amicus Curiae:

*Colonel T.G. Hess,* USMC, and *Lieutenant Commander Lawrence W. Muschamp,* JAGC, USN (on brief)—For Appellate Government Division, USN.

*Captain James C. Sinwell* (argued); *Lieutenant Colonel Brenda J. Hollis* (on brief)—For Appellate Government Division, USAF.

*Lieutenant Commander G. Arthur Robbins* (argued); *Lieutenant Commander Charles J. Bennardini* (on joint brief)— For Appellate Defense and Appellate Government Divisions, USCG.

*Opinion of the Court*

CRAWFORD, Judge:

Appellant was convicted, contrary to his pleas, by a general court-martial composed of officers of committing indecent acts on a child, in violation of Article 134, Uniform Code of Military Justice, 10 USC § 934. He was sentenced to a bad-conduct discharge, confinement for 3 months, total

forfeitures, and reduction to the lowest enlisted grade. The convening authority approved the sentence, and the Court of Military Review affirmed the findings and sentence without opinion. We granted review on the following issues:

## I

WHETHER APPELLANT WAS PREJUDICED BY ADMISSION OF HEARSAY EVIDENCE THAT DID NOT QUALIFY AS MIL.R.EVID. 803(4) EXCEPTION MATERIAL BECAUSE THE HEARSAY DECLARANT HAD NO EXPECTATION OF RECEIVING MEDICAL BENEFIT BY MAKING THE STATEMENT.

## II

WHETHER APPELLANT HAS BEEN DENIED EFFECTIVE ASSISTANCE OF COUNSEL ON APPEAL BEFORE THE ARMY COURT OF MILITARY REVIEW.

### FACTS

Appellant and another soldier were invited to a friend's house on July 3 for an early celebration of the fourth of July with the soldier's wife and 5–year–old daughter. Appellant and his buddy had started drinking early and were fairly well inebriated. The friend's 5–year–old daughter knew appellant and played with him before being told to go to bed. Appellant volunteered to go upstairs and read her a story. Appellant, however, was too drunk to focus on a book, and after a while the mother came upstairs and finished the story. In the interim, however, appellant had been playing with the 5–year–old, tickling her and carrying on. After the mother finished the story, appellant stayed with the 5–year–old at her request until she went to sleep. Subsequently, appellant came downstairs and everything appeared to be fine.

Some 14 or 15 days later, the 5–year–old told her father that appellant had touched her in her private part and "doggy kissed" her around the face. She said that she had kept it a secret at the request of appellant

because they were boyfriends and girlfriends. The father worried about this briefly, and then the daughter told the mother. Shortly thereafter, the parents took the daughter to a psychologist, Dr. Dorothy J. Calhoun, who examined the child to determine whether she had suffered any psychological damage and to assure that the child did not blame herself for this occurrence.

At trial, the Government introduced the child's statements about the incident to Dr. Calhoun under the medical-treatment exception to the rule against hearsay, Mil.R.Evid. 803(4), Manual for Courts–Martial, United States, 1984. The defense made a hearsay objection, see Mil.R.Evid. 802, which was overruled by the military judge.

As the Appendix indicates, the victim testified at trial that she thought Dr. Calhoun would help her and also help appellant. At various times the victim testified that she visited Dr. Calhoun to help appellant and at other times to help herself or to help both. Dr. Calhoun testified that the victim came to her to receive professional treatment and that there was some evidence that she benefited from that treatment.

In addition to the testimony of Dr. Calhoun, the 5–year–old victim, who was a reluctant witness, testified that appellant "touched me right here" (indicating between her legs), outside her pajamas, and that appellant "made a doggie kiss" and "licked her mouth."

On appeal to the court below, appellant's detailed appellate counsel noted in a footnote that, pursuant to *United States v. Grostefon*, 12 MJ 431 (CMA 1982), appellant wished review of the victim's hearsay statement. The court below, in a decision without opinion, noted simply that the issue had been considered in affirming the findings of guilty and the sentence.

### DISCUSSION

#### I

Regarding the first granted issue, the foundational facts required by Mil.R.Evid. 803(4) are that a statement:

(1) was made;

(2) near the pivotal time of events;

(3) to an individual who could render medical diagnosis or treatment;

(4) by an individual who had an expectation of receiving treatment from the recipient of the statement; and

(5) refers to the person's mental or emotional condition.

 The question of admissibility of the 5–year–old's statement in this case depends on satisfaction of the fourth foundational element. This Court has addressed admissibility of statements under the medical-treatment exception to the rule against hearsay on numerous occasions. *See United States v. Edens*, 31 MJ 267 (CMA 1990); *United States v. Dean*, 31 MJ 196 (CMA 1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 1106, 113 L.Ed.2d 215 (1991); *United States v. Arruza*, 26 MJ 234 (CMA 1988), *cert. denied*, 489 U.S. 1011, 109 S.Ct. 1120, 103 L.Ed.2d 183 (1989). The rationale for Mil.R.Evid. 803(4) is the self-interested motivation to speak the truth to a treating physician or an individual in the mental health field in order to receive proper care and the necessity of the statement for a diagnosis or treatment. *See* Drafters' Analysis, Manual, *supra* at A22–43 to A22–44.

Existence of this self-interested motivation to speak the truth is the focus of several cases decided by this Court. In *United States v. Dean, supra,* the accused was charged with raping and committing sodomy on his 6–year–old daughter. The question was whether statements made to a Ms. Berson, the coordinator of the child protection team at Duke University Medical Center, and to a Ms. Miller, a staff psychologist at the Wayne County Mental Health Center, were admissible under Mil. R. Evid. 803(4).

Ms. Berson interviewed the daughter for the purposes of medical diagnosis to determine if sexual abuse had occurred *and to ascertain the identity of the perpetrator.* Identity is important because, if the perpetrator is not identified, the child might go back into the same environment where she

is being victimized, and thus therapy will not be effective. As to whether the daughter believed she was receiving medical treatment, information was presented that the daughter had weight problems, had been examined by several doctors in the past, and had been an inpatient in a hospital. Therefore, she could reasonably expect to benefit from being truthful to Ms. Berson, even with respect to questions dealing with sexual abuse.

The interviews with Ms. Miller, on the other hand, were not in a hospital context. The daughter had been referred to Ms. Miller because another doctor was not able to establish a rapport with her. The accused's wife testified that she had told the daughter to cooperate with Ms. Miller because Ms. Miller was there to help the daughter and that she could speak openly with her. Under both circumstances the Court found that the judge could reasonably conclude that the daughter expected to obtain a benefit from giving truthful answers and that, considering the rationale behind the rule, the statements made to Ms. Miller and to Ms. Berson were admissible.

Likewise, in *United States v. Edens, supra,* statements made by a 3–year–old who was very open with a pediatrician, understood the seriousness of talking to him, and remembered speaking to the doctor, were held to have been made for the purpose of medical diagnosis or treatment and the patient had some expectation of receiving medical benefits.

In two other cases, however, this Court has held statements sought to be admitted under a hearsay exception pursuant to Mil. R.Evid. 803(4) to be inadmissible. In *United States v. Avila,* 27 MJ 62, 66 (CMA 1988), *cert. denied,* 493 U.S. 1002, 110 S.Ct. 562, 107 L.Ed.2d 557 (1989), the accused was convicted of committing sodomy with a 4–year–old female. The Court held that the 4–year–old's statement to a psychologist who "introduced herself ... as 'Kathy' and presented herself as 'just another Mommy' " was not admissible because it did not appear that the child knew the

person was capable of rendering treatment and required information in order to help her. Likewise, in *United States v. Williamson,* 26 MJ 115 (CMA 1988), the Court held that statements to a social worker 2 or 3 weeks after the alleged child abuse were inadmissible. The social worker examined the child at the request of her maternal grandmother who was seeking custody of the child. There was nothing in the record indicating that the statements were made for the purpose of medical treatment or diagnosis or that the victim had any expectation of receiving medical benefit or treatment.

Turning to this case, the question of admissibility of the 5-year-old's statements to Dr. Calhoun is a viable and important issue. Hence, it appears this issue deserves zealous appellate advocacy before the Court of Military Review.

## II

■ Concerning the second granted issue, we are presented with the opportunity to consider it in light of *United States v. Grostefon,* 12 MJ 431 (CMA 1982), to determine whether the minimum standards set forth to address post-trial issues specified by servicemembers convicted by courts-martial adequately safeguard their right to counsel.

The practice of allowing appellate counsel merely to identify issues without providing any factual or legal basis for them, in essence to fail to brief them, has left appellate courts with bare bones allegations which either must be decided as is, specified as issues by the court, or remanded for further review. This is precisely the dilemma presented by this case.

The choice whether to merely call the attention of an appellate court to an issue through a *Grostefon* footnote or to affirmatively advocate an issue by briefing it rests with counsel. That choice, however, is subject to scrutiny under the circumstances of each individual case. *See Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

The decision of the United States Army Court of Military Review is set aside. The record of trial is returned to the Judge Advocate General of the Army for remand to that court for further review under Article 66, UCMJ, 10 USC § 866.

Chief Judge SULLIVAN and Judge COX concur.

## APPENDIX

[K] was recalled as a witness by the prosecution and testified as follows:

(Mrs. [J] was seated next to the witness.)

\* \* \*

Q. Do you know why mom and dad wanted you to talk to Dr. C?

A. I don't know.

Q. Did Dr. C help you?

A. Yes.

Q. How did she help you?

A. She's going to help Tom, too.

Q. How is she going to help Tom?

A. I don't know. I saw her today; I saw her in the hallway. When I was sitting in your office I saw her.

Q. Do you think Dr. C helped you?

A. Yes.

Q. Do you know how she helped you?

A. I don't know.

Q. Did you go to Dr. C for any help?

A. Yes.

Q. What kind of help?

A. Helping Tom and helping me.

Q. How is she going to help you?

A. She's trying to help me by telling me what do I have to do and stuff.

\* \* \*

### CROSS-EXAMINATION

\* \* \*

Q. Why did you go see Dr. Calhoun?

A. Because.

Q. Was it because your mom and dad told you she would help Tom?

A. Yes.

Q. And that's the reason you went?

A. Yes.

\* \* \*

### EXAMINATION BY THE MILITARY JUDGE

\* \* \*

Q. When you talked to Dr. Calhoun and told her about what had happened, do you know why you were seeing Dr. Calhoun that day?

A. (Witness indicated in the negative.)

Q. Do you know what Dr. Calhoun does?

A. (Witness indicated in the negative.)

Q. Is Dr. Calhoun—do you think Dr. Calhoun is a doctor like a doctor who helps people?

A. Yes.

Q. When you talked to Dr. C about what had happened with you and Tom up in the bedroom, did you know then that Dr. C was a doctor who helps people?

A. Yes.

\* \* \*

Dr. Dorothy J. Calhoun ... testified as follows:

\* \* \*

Q. What was she there for that day?

A. She was there to talk to me and try to get some understanding as to how it happened and what contribution she had made to it—actually just make her feel okay about where she was at that time.

Q. Did [K] know why she was there that day?

A. Yes, she did.

Q. How do you know that?

A. Because she told me.

Q. What did she tell you she was there for?

A. Well, I asked her. She came into my office with her parents and she asked them to leave. She told them that she could talk to me alone. And that was after I had established a certain amount of rapport with her in the presence of the parents. And when they left I asked her if she knew why she was there and she said yes. And I said tell me about it—and she did.

Q. Did you counsel her that day?

A. Yes.

Q. Do you think [K] understood what you were doing?

A. Yes.

Q. What makes you say that?

A. Because there was evidence when she left that she felt better. And basically what I did was to try to help her put in perspective what she alleged had happened to her. And the process of doing that with any child that age is to let them know that they have nothing to do with it, that it was something that was done to them. And to reassure them that they are okay and that everything is going to be fine as much as possible.

Q. Doctor Calhoun, have you had opportunities to deal with other children of [K]'s age who have been the victims of sexual abuse?

A. Yes, I have.

Q. Are they on an average able to understand for what reason they are in your office?

A. Yes, they are.

Q. And could you state again for the court what that reason is?

A. Well, usually when they get to me, their parents have told them that we're going to go some place and get you some help. Most parents do not feel objective enough to deal with their children under these circumstances. Even though we have a much closer rapport with them as parents, they still feel that a professional person can reassure them in a different way that they're okay. Oftentimes children of that age associate whatever behav-

ior happens to them from adults, that they somehow have caused it. . . .

\* \* \*

## CROSS-EXAMINATION

Questions by Defense Counsel:

Q. Dr. Calhoun, you don't know what the parents told her, do you as far as why she was there?

A. I know what they told her in my presence, but prior to that, no, I wouldn't have any way to know.

Q. And her concern was that Tom get some help, wasn't it?

A. Yes.

Q. And that is the reason she thought she was there?

A. Throughout the conversation that was one of the things that she wanted to have happen.

DC: Thank you. I have nothing further.

MJ: Anything further, Captain Basnight?

## REDIRECT EXAMINATION

Questions by the Prosecution:

Q. Was she concerned at all about getting help for herself?

A. I don't remember her saying it in that way. I think she associated being there, talking to me was part of her getting help.

Q. And what made you feel that way?

A. Because that's what her parents had told her in my presence.

Q. What did they tell her?

A. They told her that she was to talk to me and tell me what happened so that I could help her.

GIERKE, Judge, joined by Judge WISS (concurring in part and dissenting in part):

I agree with the Opinion of the Court that there appears to be a viable issue of fact in this case which deserves vigorous advocacy before the Court of Military Review, with its unique factfinding powers. Art. 66(c), Uniform Code of Military Justice, 10 USC § 866(c). I reserve judgment on the merits of appellant's claim of prejudicial error; I am concerned at this point only that there has not been full litigation of an essential factual issue.

I disagree with the implication in the Opinion of the Court (35 MJ at 348) that compliance with *United States v. Grostefon,* 12 MJ 431 (CMA 1982), is measured by *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In *Grostefon* we established a standard of appellate advocacy higher than *Strickland,* based on Article 66, and Article 70, UCMJ, 10 USC § 870, rather than on the Constitution. *United States v. Tyler,* 34 MJ 293 (CMA 1992); *United States v. Arroyo,* 17 MJ 224 (CMA 1984).

I agree that we must remand this case to the Court of Military Review. Since we do not know what legal or ethical considerations may have prompted appellate counsel to submit the hearsay issue to the Court of Military Review without briefing it, we should give appellate counsel the option of briefing the issue before the Court of Military Review or explaining why they have not done so. *See United States v. Tyler, supra.*