# UNITED STATES

v.

**Donald C. KNOX, 420 98 1467 Sergeant (E–5), U.S. Marine Corps.**

**NMCM 95 00358.**

U.S. Navy–Marine Corps
Court of Criminal Appeals.

Sentence Adjudged 25 March 1993.

Decided 31 March 1997.

Kenneth D. Neeves, Civilian Defense Counsel.

Maj J.F. Havranek, USMC, Appellate Defense Counsel.

LT David M. Harrison, JAGC, USNR, Appellate Government Counsel.

Before McLAUGHLIN, LUCAS and WYNNE, JJ.

McLAUGHLIN, Senior Judge:

The appellant was tried at a general court-martial composed of members on various dates from 10 December 1992 to 25 March 1993. Contrary to his pleas, he was convicted of one specification of rape on divers occasions and one specification of forcible sodomy with a child under the age of 16 years on divers occasions, in violation of Arti-

cles 120 and 125, Uniform Code of Military Justice, 10 U.S.C. §§ 920, 925 (1994) [hereinafter UCMJ], respectively. The appellant was sentenced to confinement for 30 years, forfeiture of all pay and allowances, reduction to pay grade E–1, and a dishonorable discharge. The convening authority approved the sentence as adjudged and, except for the dishonorable discharge, ordered it executed. The appellant has assigned nine errors, attached as Appendix I. We find merit with a number of the assigned errors, and agree that these errors materially prejudice the substantial rights of the appellant. Accordingly, we shall set aside the findings. Art. 59(a), UCMJ, 10 U.S.C. § 859(a). Because we authorize a rehearing, we need comment on Assignments of Error I through III only. Art. 66(d), UCMJ, 10 U.S.C. § 866(d).

The appellant and his wife are the natural parents of the two victims named in the specifications. The appellant was convicted of multiple rapes of his daughter, CK, born on 30 August 1985, and the forcible sodomy of his son, TK, born on 30 August 1984. The 6–month time period of the allegations as set forth in the specifications, i.e., July 1990 to December 1990, coincides with the time the family lived in "the blue house" (as referred to by the children) in Havelock, North Carolina.

The children remember their stay in the blue house, but, understandably, do not know the dates. While they were living in the blue house, Mrs. Knox cared for the children by day and worked outside the home in the evening. Record at 23, 334–35. The appellant returned from his daytime military duties and cared for the children while his wife was at work. *Id.* The appellant never lived in the blue house after December 1990.

After the appellant's return in April 1991 from his deployment to Saudi Arabia in support of Operations Desert Shield and Desert Storm, he was served with divorce papers and moved into the barracks aboard Camp Lejeune, North Carolina. According to Mrs. Knox, prior to the appellant's December 1990 deployment, the marriage was deteriorating and she and the appellant slept apart. The appellant testified that the divorce was acrimonious, his wife was uncooperative in allowing him visitation of the children, and he had countersued for custody of the children. Record at 470–72. Mrs. Knox testified that the appellant was unreliable in his announced visitation and sometimes wouldn't show up. When these visits did occur between April 1991 and December 1991, they lasted for a few hours and the children were never alone with the appellant. Record at 25.

Sometime in January 1992, Mrs. Knox was preparing CK and TK for a visit with the appellant. For unstated reasons, the entire family used a friend's house for the visits. As CK was being dressed for the visit, Mrs. Knox received a telephone request for transportation from another friend. CK overheard this telephone conversation, and learned that her mother would not accompany her at the outset of the visit with the appellant. Record at 28. CK was told that the friend, Patricia, who lived at the house where the visit would occur, would be present. *Id.* According to Mrs. Knox's testimony, it was then that CK told her mother that the appellant had sexually abused her in the blue house. *Id.* This led to an investigation that ultimately resulted in TK's allegations of sexual abuse and the current charges.

## I. EXPERT OPINION REGARDING BELIEVABILITY OF ALLEGED VICTIM

The first assignment of error arises out of the testimony of the social worker who testified for the Government. When CK first made the report to her mother about sexual abuse, Mrs. Knox took her to a Navy hospital within days. Record at 348. The medical officer referred Mrs. Knox and the children to Ms. Skulstad, a social worker in private practice. In fact, it was Ms. Skulstad who later reported the abuse to police authorities. Record at 83. Upon taking the stand, and after establishing her *bona fides,* the social worker described the beginnings and course of her therapy with Mrs. Knox and the two children. Record at 389–96. Included in her testimony was a description of some drawings made by the children. Prosecution Exhibits 1—8. They were offered as the children's depictions of the abusive conduct of their father. At one point the following col-

loquy occurred between the trial counsel and the expert:

Q: Did you at all try to interpret any of these pictures yourself?

A: I consider them an expression of what the child is telling me, *I believe the child.*

Record at 396 (emphasis added). The defense counsel immediately objected. The military judge warned the trial counsel that "I'm close to granting a mistrial in this case," and sustained the objection. *Id.* The military judge also commented that "I'm very concerned about the witness, particularly in a child abuse case, vouching for the credibility of a witness." Record at 398. The trial defense counsel argued that a mistrial was the only valid remedy for the impermissible testimony. *Id.* The military judge denied the mistrial request, but did give a cautionary instruction to the members that they should disregard the expert's opinion regarding the believability of the children. Record at 403. Each member indicated that the instruction was understood and would be followed. Record at 404.

■ We recognize, as did the military judge, that a mistrial is a "drastic remedy and is reserved for only those situations where the military judge must intervene to prevent a miscarriage of justice." *United States v. Garces,* 32 M.J. 345, 349 (C.M.A. 1991). This case was a fully contested battle of credibility. The children testified. The appellant testified and denied committing the abuse. Medical evidence was inconclusive regarding CK's physical condition and there was no medical evidence regarding TK. The physician testified that the physical examination of CK "was equivocal and does not confirm or deny [sexual activity]." Record at 446–47. There was little, if any, reliable corroborating evidence.

In *United States v. Marrie,* 43 M.J. 35 (1995), another child sexual-abuse case, the expert witness erroneously testified as to the credibility of a victim and the Court of Appeals found it was harmless error. We cannot hold in the appellant's case that, when we consider the social worker's testimony in context with the other evidence in the record, the error is harmless beyond a reasonable doubt. In reaching this conclusion, we note,

for example, that TK was a very poor witness, actually testifying more as to what his drawings represent the appellant doing *in the drawings* than to what the appellant actually is alleged to have done to him. Record at 303–10.

In this regard, the appellant's case is more similar to *United States v. Harrison,* 31 M.J. 330 (C.M.A.1990). In *Harrison,* the expert testified that, in his opinion, the victim was reliable and had been sexually assaulted. In finding error, which could not be cured by a cautionary instruction identical to the instruction given in the appellant's case, our superior court stated, "it is impermissible for an expert to testify about his or her belief that a child is telling the truth regarding an alleged incident of sexual abuse." *Harrison,* 31 M.J. at 332 (citing *United States v. Arruza,* 26 M.J. 234 (C.M.A.1988), *cert. denied,* 489 U.S. 1011, 109 S.Ct. 1120, 103 L.Ed.2d 183 (1989); *United States v. Petersen,* 24 M.J. 283 (C.M.A.1987)).

Notwithstanding the cautionary instruction given in the appellant's case, we will not indulge in "[t]he naive assumption that all prejudicial effects can be overcome by instructions to the jury, [that] all practicing lawyers know to be unmitigated fiction...." *Krulewitch v. United States,* 336 U.S. 440, 453, 69 S.Ct. 716, 723, 93 L.Ed. 790 (1949)(Jackson, J., concurring) (citation omitted).

The first assignment of error has merit. Not only is the prejudice evident in the expert's opinion regarding the truthfulness of the children, but it is exacerbated by the fact that the expert was testifying in the context of also vouching for the truthfulness of the otherwise *inadmissible* drawings which were then introduced as real evidence. In this regard, the error is more profound than the prejudicial error in *Harrison.* The military judge erred in failing to grant a mistrial.

## II. HEARSAY

### A. MIL. R. EVID. 803(4) AND ALLEGED VICTIMS' DRAWINGS

■ Assignment of Error II involves hearsay. It is based on the military judge's

decision overruling defense objections and the defense opposition to the Government's motion *in limine* to admit specific hearsay statements, which included both oral statements and the children's drawings. Appellate Exhibits I, III. Some of the defense objections were sustained, or the Government abandoned its attempt to introduce contested evidence. To resolve this assignment of error, we need analyze the relationship between the children and the social worker. Admitted into evidence, among other things, were eight drawings made by CK and TK. The drawings are Prosecution Exhibits 1—8. Prosecution Exhibits 1—4 are drawings made by CK at home. Prosecution Exhibit 5 is a drawing made by CK during a therapy session at the request of, and in the presence of, Ms. Skulstad. Prosecution Exhibit 6 is a drawing made by TK at Ms. Skulstad's clinic. Prosecution Exhibits 7 and 8 are drawings made by TK at the Naval Criminal Investigative Service (NCIS) offices at the request of an NCIS agent. These drawings constituted out-of-court statements offered, and admitted, for the truth of the matter asserted. MIL. R. EVID. 801. A statement includes oral or written expression and nonverbal conduct of a person, if it is intended as an assertion. It includes drawings and descriptions of the drawings. In this case, CK and TK intended that their illustrative sketches be assertions explaining past events. This is not in dispute and is reflected in the military judge's ruling. Record at 222–23. Hearsay is inadmissible unless an appropriate exception to its preclusion is provided for by law. MIL. R. EVID. 802 (the hearsay rule), 803, 804. These out-of-court statements and out-of-court drawings from both children were admitted under the medical-care exception to the hearsay rule set forth in MIL. R. EVID. 803. Record at 117. The pretrial drawings were hearsay. Because no exception applied, we conclude that Prosecution Exhibits 1—4 and 6—8 were inadmissible.

The medical-care exception to the general rule barring the admissibility of out-of-court statements for the truth of the matter asserted is found in MIL. R. EVID. 803. That rule allows, as admissible hearsay: "Statements made for the purposes of medical diagnosis or treatment and described medical history, or past or present symptoms, pain, or sensation, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." MIL. R. EVID. 803(4).

■■■ Statements to a social worker can be admissible under MIL. R. EVID. 803(4), if made under the proper circumstances. *See United States v. Faciane*, 40 M.J. 399, 403 (C.M.A.1994). For our purposes, the foundational requirements for admission of hearsay statements under MIL. R. EVID. 803(4) were set forth in *United States v. Quigley*, 35 M.J. 345 (C.M.A 1992), *aff'd after reh'g*, 40 M.J. 64 (1994). *See also United States v. Siroky*, 44 M.J. 394 (1996); *United States v. Ureta*, 44 M.J. 290 (1996). In *Quigley*, the U.S. Court of Military Appeals (now the U.S. Court of Appeals for the Armed Forces) set aside the lower appellate court's decision and ordered briefing on the medical-exception hearsay issue. In doing so, the court stated:

> [T]he foundational facts required by Mil. R. Evid. 803(4) are that a statement:
>
> (1) was made;
>
> (2) near the pivotal time of events;
>
> (3) to an individual who could render medical diagnosis or treatment;
>
> (4) by an individual who had an expectation of receiving treatment from the recipient of the statement; and,
>
> (5) refer's to the person's mental or emotional condition.

*Quigley*, 35 M.J. at 346–47.

The social worker testified that, when the children first came to her for evaluation and treatment in January 1992, on referral from the Navy pediatrician, they did not know why they were seeing her. Record at 392. The social worker was qualified as an expert in the "area of child sexual abuse" at an Article 39(a), UCMJ hearing, 10 U.S.C. § 839(a). Record at 74. At that hearing, she explained to the trial judge what happens at a typical first session:

> Q. What do you usually—what do you tell them about this [why they are there].
>
> A. First I ask the child if she knows why she's here *and if she doesn't agree, I'll correct her.*

Q. What do you tell her why she's there?

A. I tell her that she came here because I am a person who works with children who have been hurt, or who are sad, and who need to talk and play about something that bothers them. And that she will come and talk and play here until she can feel better about what happened to her and that I see many children who have been hurt or who are sad, and they come here and I try to help them.

\* \* \*

Q. Now, do you interrogate the children to tell you about the incidents or do you let them display it in their own time?

A. *I affirm that I know what happened to them generally and that they need to talk about it here.*

Record at 76–77 (emphasis added). Later, during direct examination, the social worker testified as follows:

Q. What—what happened at the first meeting that you can recall?

A. I asked the children if they knew why they were here and they didn't know, so I told them that the doctor at *the hospital had sent them to me because something bad had happened to ... [CK].*

Q. Did you let them know that you were there to help them?

A. Yes. I said that I see many children who have been hurt or who are sad and I try to help them feel better.

Record at 81 (emphasis added). At trial, CK was asked if she knew why she was seeing the social worker. CK's answer was: "No." Record at 279. We do not consider CK's answer at the court-martial to be determinative of the analysis regarding the admissibility of her statements to the social worker. Based on the social worker's testimony, we find that CK had a 7–year–old child's understanding of the relationship between her and the social worker and is a poor historian of the initial circumstances of the establishment of that relationship. Relying on the social worker's testimony, we find that CK appreciated that the social worker was a special person who was there to help. Under our case law, we consider the social worker to be a health-care professional who fulfilled the

requirements of admissibility of CK's statements during therapy under MIL. R. EVID. 803(4). *Faciane,* 40 M.J. at 403.

Prosecution Exhibits 1—4 are drawings made by CK, at home, in April 1992. The social worker had not requested that CK make these drawings and, therefore, they are not admissible under the MIL. R. EVID. 803(4) exception. Record at 395 ("I had never asked them to draw this."). There is no evidence that the at-home drawings "were made to an individual who could render ... treatment." *Quigley,* 35 M.J. at 346–47. The record indicates that they were merely drawn as a home activity while CK was alone in her bedroom. Record at 84. Therefore, Prosecution Exhibits 1—4 are inadmissible hearsay.

TK's expectations of treatment and treatment status are more troublesome. TK had not previously reported any abuse by the appellant until well into his sister's treatment. In fact, TK denied any abuse when he was initially interviewed. Record at 53–54, 65. The focus of the social worker's initial interview was on CK as a victim of hurt in need of help. TK was present as a member of a family in crisis. It wasn't until the family's therapy was in its fourth month, during which CK had been the identified focus of the therapists attention, and after CK had created drawings at home, that TK spontaneously drew a picture, Prosecution Exhibit 6, at the social worker's clinic. Record at 90. We are not convinced that this drawing was made under the conditions set forth in *Quigley.* Prosecution Exhibit 6 is inadmissible.

We also conclude that the diagrams prepared at the Naval Criminal Investigative Service Office by TK at the request of law enforcement officers, and subsequently given to the expert witness by those officers, i.e., Prosecution Exhibits 7 and 8, are inadmissible hearsay. None of the requirements of MIL. R. EVID. 803(4) are fulfilled. These diagrams were an important aspect of TK's otherwise confusing testimony. Record at 303–10.

Because we base our holding of the inadmissibility of Prosecution Exhibits 1—4 and 6—8 on the absence of other requirements

for admissibility under MIL. R. EVID. 803(4), we need not, and do not, decide whether the temporal requirement, i.e., "near the pivotal time of events" set forth in *Quigley* has been met for Prosecution Exhibits 1—8.

The error in admitting the above described inadmissible hearsay evidence was not cured when CK and TK identified and explained the drawings in court subject to cross-examination, nor was it cured when CK presented the at-home drawings to the social worker after having created them at home, without a request from the social worker that she make any drawings. The evidence remains objectionable because the declarant was not subject to cross-examination at the time the statements (drawings) were made, nor was the declarant a witness before the court-martial when they were made, nor did any exception to the hearsay rule apply at the time the drawings were made. These conditions are necessary to ensure that the statements were originally made without improper influence or suggestion and to give the jury the opportunity to observe the demeanor of the declarant while making the statement. These are the dangers of inadmissible hearsay, which are not eliminated by producing the declarant at trial. They can only be eliminated by not introducing the out-of-court statements (the drawings) into evidence. If drawings would be helpful in presenting the children's testimony, the appropriate alternative is for the children to draw pictures as visual aids contemporaneously with the testimony in court. Visual aids are a part of the witness' testimony but they are not a substitute for testimony, nor are they admitted as exhibits. Additionally, the dangers of inadmissible hearsay are not eliminated by carefully recounting the many useful purposes for which the statements, or drawings, were used.

■ The error in admitting Prosecution Exhibits 1—4 and 6—8 is not harmless under Article 59(a), UCMJ, 10 U.S.C. § 859(a). In fact, in explaining his rationale for admitting the drawings, the military judge stated that:

> [H]aving witnessed the testimony of the two witnesses now,. .[TK] and ... [CK], it's obvious that both witnesses absolutely had to have these diagrams in order to complete their testimony. There was no way that they were going to be able to testify in words without the use of these diagrams, and I feel—I conclude very strongly that these diagrams were extremely helpful to the triers of fact and to the witnesses as well in explaining their testimony.

Record at 327. Although we disagree with the military judge as to the need the witnesses had for use of the hearsay drawings, and as to the admissibility of seven of the drawings, we do agree that they had a powerful, albeit improperly prejudicial, impact on the members.

### B. ALTERNATIVE THEORIES OF ADMISSIBILITY OF THE DRAWINGS

■ The military judge also opined that the drawings were admissible as demonstrative evidence. Record at 223. The drawings were not given the limited handling of demonstrative evidence, i.e., demonstrative evidence is not published to the members, and the members were not instructed on the limited use of demonstrative evidence. More importantly, they were admitted as substantive evidence. The alternative avenue of admissibility as demonstrative evidence, if viable at the outset, was extinguished by the judge's admission of the drawings without limitation.

■ The Government argues that the admission of CK's drawings was proper under MIL. R. EVID. 801(d)(1) as prior consistent statements of CK to rebut a defense inference that CK had been recently subjected to influence by Mrs. Knox to fabricate her testimony. In order to be admissible under MIL. R. EVID. 801(d)(1)(B), the prior consistent statement must have been made prior to the alleged fabrication, or before the alleged improper influence or motive arose. *Tome v. United States*, 513 U.S. 150, 115 S.Ct. 696, 130 L.Ed.2d 574 (1995); *United States v. McCaskey*, 30 M.J. 188 (C.M.A.1990). In the appellant's case, the influence suggested by the defense, acrimonious divorce proceedings and the appellant's counterclaim for child custody, existed as possible motivators for Mrs. Knox to influence the children into

making false allegations of abuse prior to the first report of the offense by CK. Thus, because the children's statements and drawings were made after the alleged improper influence or motive to lie arose, they are not admissible under MIL. R. EVID. 801(d)(1)(B). Additionally, prior statements are not admissible as substantive evidence "to rebut every implicit charge that a witness' in-court testimony results from recent fabrication or improper influence or motive...." *Tome*, 513 U.S. at 165–67, 115 S.Ct. at 705. In the brief at trial, the Government moved in the alternative to have the drawings admitted under the so-called residual hearsay rule, MIL. R. EVID. 803(24). The flaw in that argument is that CK testified in a very straight-forward manner. In order to use the hearsay exception under MIL. R. EVID. 803(24), the statement must, among other things, be "more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts." MIL. R. EVID. 803(24)(B).[1] In the appellant's case, CK's in-court testimony is the most probative evidence of the abuse. TK's testimony is less straightforward than CK's, but his drawings, without TK's testimony, are probative of nothing, so they could not be more probative than the testimony of TK.

### C. MIL. R. EVID. 803(2) AND STATEMENTS OF ALLEGED VICTIM TO HER MOTHER

Assignment of Error III has merit. The error is not harmless. Art. 59(a), UCMJ, 10 U.S.C. § 859(a). As noted earlier, according to Mrs. Knox's testimony, upon learning that her mother would not be present for the January 1992 visit with the appellant, CK told her mother that she did not want to go because she thought the appellant was going to hurt her. Record at 28–32. This resulted in an argument between Mrs. Knox and CK which resulted in Mrs. Knox's temper rising and CK becoming upset. *Id.* At this time CK told her mother that the appellant did nasty things to her. Mrs. Knox inquired as to what the nasty things were that the appellant did, and CK demonstrated

sexual intercourse. *Id.* This testimony was admitted by the military judge, over defense objection, under MIL. R. EVID. 803(2), as an excited utterance. Record at 113–14. The military judge premised his ruling on a finding that the revelation was made while CK was excited from the startling event of learning her mother was not going to be with her at the upcoming visit with the appellant. *Id.*

The statements by CK were an example of delayed reporting, made more than 1 year after any abusive conduct was alleged to have occurred, and well after CK's opportunity to privately report the assaults to her mother. To be admissible, an excited utterance must be made while under the excitement of the offense being prosecuted. *See generally United States v. Grant*, 42 M.J. 340 (1995) (holding 36 to 48 hours between assault and excited report not within MIL. R. EVID. 803(2) hearsay exception); *United States v. Arnold*, 25 M.J. 129 (C.M.A.1987)(holding report must be made at first opportunity to make complaint privately to be admissible under MIL. R. EVID. 803(2)); *United States v. Spychala*, 40 M.J. 647 (N.M.C.M.R.1994) (holding statement must be made contemporaneously with the excitement- or stress-causing event); *see also United States v. Miller*, 32 M.J. 843 (N.M.C.M.R.1991) (holding lapse of time between excitement- or stress-causing event not *primary* focus of MIL. R. EVID. 803(2)(analysis). Additionally, CK's report of the assault was in a reflective narrative (until the conversation became heated) and was not an excited utterance. *Spychala*, 40 M.J. 647. Therefore, CK's statements are not admissible as excited utterances, and the military judge erred by admitting them.

### D. ALTERNATIVE THEORY OF ADMISSIBILITY OF CK'S STATEMENTS TO HER MOTHER

The Government argues that admitting the statements made by CK to her mother in January 1992 regarding the alleged abuse was harmless error. The Gov-

---

1. The military judge recognized this provision of Mil. R. Evid. 803(24) regarding the statements made by CK and TK to the NCIS that the Gov-

ernment attempted to introduce under this theory. Record at 47.

ernment also argues that the statements by CK were admissible, not for their truth, but to show the impact of the statements on Mrs. Knox. Insofar as this might be relevant and a viable avenue of admission, the members were not instructed on any limited use of the statements and, therefore, this theory of admissibility is not available to the Government. The military judge was equally unimpressed by a similar argument made at the court-martial. Record at 111–12.

For the reasons set forth, *supra,* regarding the admissibility of the drawings, MIL. R. EVID. 803(24) is not a valid theory of admissibility in this case for the statements made by CK to Mrs. Knox in January 1992.

## CONCLUSION

Optimally, every person who criminally abuses a child, physically or sexually, would be caught, convicted, and punished appropriately for the offense. As a result, the certainty of detection, conviction, and punishment would act as a strong deterrent, protecting children from such abuse. But the rules of evidence have been developed painstakingly over centuries to ensure, to the extent it is humanly possible, the reliability of convictions. The rules of evidence cannot be overlooked, set aside, or circumvented in the zeal to prosecute any crime, no matter how heinous. In a court of law the ends never justify the means. It is our responsibility to overturn the results of well-meaning efforts to use manners of proof which do not meet the standards of admissibility established by the rules of evidence regardless of the nature of the offense. As recently stated by the U.S. Supreme Court: "Courts must be sensitive to the difficulties attendant upon the prosecution of alleged child abusers. In almost all cases a youth is the prosecution's only eye witness. But 'this Court cannot alter evidentiary rules merely because litigants might prefer different rules in a particular class of cases.'" *Tome,* 513 U.S. at 165–67, 115 S.Ct. at 705 (quoting *United States v. Salerno,* 505 U.S. 317, 322, 112 S.Ct. 2503, 2507, 120 L.Ed.2d 255 (1992)).

Finally, were any one or some of the errors addressed above harmless, we nevertheless would find that this case "'falls ... within the ambit of the doctrine of cumulative error—under which a number of errors, no one perhaps sufficient to merit reversal, in combination necessitate the disapproval of a finding.'" *United States v. Banks,* 36 M.J. 150, 170–71 (C.M.A.1992)(quoting *United States v. Walters,* 4 U.S.C.M.A. 617, 635, 16 C.M.R. 191, 209 (1954)).

Accordingly, the findings are set aside. A rehearing may be ordered.[2] Art. 66(c), UCMJ, 10 U.S.C. § 866(c).

Judge LUCAS concurs.

WYNNE, Judge (concurring in result):

I join the majority in affording relief to the appellant. I believe their analysis is also correct under military law, as we know it, and I do not criticize them for applying it. *See United States v. Allbery,* 44 M.J. 226 (1996). I do not join in the application of this law to the present case, however, because I do not believe it is in accord with the spirit or the letter of a recent decision from our highest court. In light of the wisdom contained in *Tome v. United States,* 513 U.S. 150, 115 S.Ct. 696, 130 L.Ed.2d 574 (1995), I would reconsider the underlying assumptions which created the template my brothers used to decide this case. *See United States v. Suarez,* 35 M.J. 374 (C.M.A.1992)

History teaches that the rules of evidence have served us well, while quasi-science on the other hand has not. *See Tome,* 513 U.S. at 165–67, 115 S.Ct. at 705. Our existing approach to child abuse cases does not recognize these simple truths. Presently, under our military law, a single "clinical social worker", Record at 389, may treat the child, describe the child's physical and emotional condition, give an expert opinion on the nature and cause of these conditions, and testify as to statements the child made during treatment. *See generally United States v. Quigley,* 35 M.J. 345 (C.M.A.1992), *aff'd after reh'g,* 40 M.J. 64 (1994); *United States v. Siroky,* 44 M.J. 394 (1996); *United States v.*

---

**2.** Prosecution Exhibit 12, a video tape, remains missing and was not a part of the record when

this record was filed with the court. This omission has not hindered us in our review.

*Ureta,* 44 M.J. 290 (1996). These hearsay statements may then be considered as substantive evidence of the events described. *Quigley,* 40 M.J. at 66. Only when the "clinical social worker" directly testifies to the veracity of the child's complaint, and not even always then, do we consider this regimen fatally flawed. *See United States v. Marrie,* 43 M.J. 35 (1995).

Of course, after extensive treatment for child abuse by a natural parent, the expert believes the child; otherwise, she is a quack. One-stop testimony of this type inevitably presumes, as fact, the nature of the child's physical and physiological problems, the cause of the problems, and, often even, the criminal act by the accused, and then magnifies the error by permitting otherwise inadmissible substantive evidence to be considered. Such testimony does not "assist the trier of fact to understand the evidence or to determine a fact in issue;" it unlawfully relieves them of their burden. MIL. R. EVID. 702, MANUAL FOR COURTS-MARTIAL, UNITED STATES (1995); see also *United States v. Whitted,* 11 F.3d 782 (8th Cir.1993).

Fundamentally, such testimony lacks the scientific detachment inherent in the purpose of its admissibility. Instead of detached professional application of scientific, technical or other specialized knowledge to the evidence, triers of fact may be presented with a surrogate witness, whose ability to objectively determine the facts in issue is less than their own. *See generally* PAUL C. GIANNELLI & EDWARD J. IMWINKELRIED, SCIENTIFIC EVIDENCE § 9–5 (2d ed. 1993 & Supp.1995). Justice is not served when only the court member's are authorized to conclude that the potentate's robes are made from whole cloth.

On the other hand, the objective scientific explanations, envisioned by the rules of evidence, can be helpful to the trier of fact. *United States v. Pagel,* 45 M.J. 64 (1996)(expert testimony that it is not necessary to believe the patient in order to render treatment for observable symptoms). Accordingly, I would hold that the testimony of the treating "clinical social worker" should be limited to the description and explanation of observable physiological and psychological conditions, and opinion as to whether this "evidence is consistent or inconsistent with the victim's allegations of sexual abuse...." *Whitted,* 11 F.3d at 785; *see also Pagel,* 45 M.J. at 67.

## APPENDIX

### ASSIGNMENTS OF ERROR

I. THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF APPELLANT WHEN HE REFUSED TO GRANT A MISTRIAL AFTER THE PROSECUTION'S EXPERT WITNESS TESTIFIED THAT THE CHILDREN WERE TRUTHFUL.

II. THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF APPELLANT WHEN HE RULED THAT THE CHILDREN'S DRAWINGS WERE ADMISSIBLE UNDER THE MEDICAL TREATMENT EXCEPTION AND FURTHER ERRED BY RULING THAT THE DRAWINGS WERE ADMISSIBLE AS DEMONSTRATIVE EVIDENCE.

III. THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF APPELLANT WHEN HE RULED THAT CHIQUITA'S STATEMENTS TO HER MOTHER WERE ADMISSIBLE AS EXCITED UTTERANCES.

IV. THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF APPELLANT WHEN HE RULED THAT THE STATEMENTS OF CHIQUITA AND TREMAINE TO MS. BETTY SKULSTAD WERE ADMISSIBLE UNDER THE MEDICAL TREATMENT EXCEPTION TO THE HEARSAY RULE.

V. THE MILITARY JUDGE ABANDONED HIS NEUTRAL ROLE AND IMPROPERLY BOLSTERED ANNIE KNOX'[S] CREDIBILITY TO THE SUBSTANTIAL PREJUDICE OF APPELLANT.

VI. THE EVIDENCE PRESENTED AT TRIAL WAS LEGALLY AND FACTUALLY INSUFFICIENT TO CONVICT APPELLANT OF THE CHARGED OFFENSES BEYOND A REASONABLE DOUBT.

VII.  THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF APPELLANT WHEN HE RULED THAT EVIDENCE OF THE UNCHARGED CRIME OF SODOMY WITH CHIQUITA KNOX WAS ADMISSIBLE AS EVIDENCE OF A COMMON PLAN OR SCHEME.

VIII.  THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF APPELLANT WHEN HE RULED THAT THE DEFENSE PSYCHOLOGICAL EXPERT COULD NOT TESTIFY AS TO PRIOR INCONSISTENT STATEMENTS OF CHIQUITA KNOX WHICH FORMED, IN PART, THE BASIS OF HIS OPINION THAT THE PROCEDURES USED BY MS. ELIZABETH SKULSTAD WERE FLAWED AND THEREFORE UNRELIABLE.

IX.  THE COURT–MARTIAL PANEL WAS IMPROPERLY BIASED AGAINST APPELLANT THROUGH EXPOSURE, DURING VOIR DIRE, TO LTC MARTINSON'S REPEATED AND VEHEMENT ASSERTIONS THAT HE COULD NOT BE IMPARTIAL BECAUSE HE KNEW THAT APPELLANT WAS GUILTY.