*This opinion is subject to administrative correction before final disposition.*

# United States Navy–Marine Corps
# Court of Criminal Appeals

Before
GASTON, HOUTZ, and MYERS
Appellate Military Judges

_____

**UNITED STATES**
*Appellee*

**v.**

**Manuel J. DOMINGUEZ**
Lieutenant Commander (O-4), U.S. Navy
*Appellant*

**No. 202000109**

Argued: 29 September 2021—Decided: 22 October 2021

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judge:
Ann K. Minami

Sentence adjudged 10 February 2020 by a general court-martial convened at Joint Base Pearl Harbor-Hickam, Hawaii, consisting of officer members. Sentence in the Entry of Judgment: confinement for 16 years and a dismissal.

For Appellant:
*Tami L. Mitchell, Esq.* (argued)
*David P. Sheldon, Esq.* (on brief)
*Lieutenant Commander Christopher K. Riedel, JAGC, USN* (on brief)
*Lieutenant Commander Michael W. Wester, JAGC, USN* (on brief)

For Appellee:
*Lieutenant Catherine M. Crochetiere, JAGC, USN* (argued)
*Lieutenant John L. Flynn, JAGC, USN* (on brief)
*Major Kerry E. Friedewald, USMC* (on brief)
*Lieutenant Jennifer Joseph, JAGC, USN* (on brief)

Senior Judge GASTON delivered the opinion of the Court, in which Judges HOUTZ and MYERS joined.

———————————

**PUBLISHED OPINION OF THE COURT**

———————————

GASTON, Senior Judge:

A panel of officers convicted Appellant, contrary to his pleas, of two specifications of rape of a child and one specification of sexual abuse of a child, in violation of Article 120b, Uniform Code of Military Justice [UCMJ],[1] for penetrating the vulva of his five-year-old daughter, Ocean,[2] with his mouth and finger and causing her to touch his genitalia for sexual gratification.

He asserts nine assignments of error [AOEs], which we renumber and restate as follows:

> **I. Did the military judge abuse her discretion in admitting two videotaped forensic interviews of Ocean (Prosecution Exhibits 10 and 11) under the residual hearsay exception, Military Rule of Evidence [Mil. R. Evid.] 807?**
>
> **II. Did the military judge abuse her discretion in denying the Defense's motion to admit evidence under Mil. R. Evid. 412?**
>
> **III. Did the military judge abuse her discretion in admitting an excerpted report of a medical examination of Ocean (Prosecution Exhibit 2) and testimony from the examining nurse regarding Ocean's statements, under the hearsay exception for statements made for medical diagnosis or treatment, Mil. R. Evid. 803(4)?**

———————————

[1] 10 U.S.C. § 920b.

[2] All names in this opinion, other than those of Appellant, the judges, and counsel, are pseudonyms.

IV. *Did the cumulative effect of the errors substantially impair the fairness of Appellant's trial?*

V. *Did the military judge abuse her discretion in denying a Defense motion for a continuance?*

VI. *Were Appellant's trial defense counsel ineffective for:*

   *(a) Failing to be prepared to rebut Prosecution Exhibits 10 and 11?*

   *(b) Failing to present expert testimony regarding Ocean's suggestibility and the impact of the influence of her mother and therapist on Ocean's reporting?*

   *(c) Failing to present evidence of Ocean's medical history, cultural norms, and gender bias in Appellant's "intimate care" of her, which would have established a legitimate non-sexual purpose for touching?*

   *(d) Failing to adequately prepare Appellant to testify?*

   *(e) Failing to timely move the court to admit evidence under Mil. R. Evid. 412?*

VII. *Is the evidence legally and factually sufficient to sustain Appellant's convictions?*

VIII. *Did the military judge abuse her discretion in failing to merge Specifications 2 and 3 of Charge I for sentencing?*

IX. *Does a mandatory minimum sentence of dismissal for rape of a child violate:*

   *(a) The Eight Amendment prohibition against cruel and unusual punishment?*

   *(b) The Fifth Amendment right to due process in receiving individualized consideration for sentencing?*

   *(c) The Fifth Amendment right to plead not guilty and require the Government to prove its case?*

We find merit in Appellant's first, second, third, and fourth AOEs, set aside the findings and sentence, and do not reach the remaining AOEs.

## I. BACKGROUND

In 2015, Appellant and his wife, Ms. Bravo, experienced marital difficulties after six years of marriage. They differed over parenting styles, and Ms. Bravo disapproved of Appellant socializing with other junior officers. In September, a verbal argument led to an intoxicated Appellant assaulting Ms. Bravo in front of their two small children and being arrested by local police in Texas. The couple subsequently talked of divorce but decided to reconcile and attend marriage counseling. In October, they moved to Hawaii, where Appellant and Ms. Bravo shared parental responsibilities over their four-year-old daughter Ocean and her younger brother, including bathing with them, wiping them after they used the toilet, spanking them occasionally, and getting them ready for bed. Appellant told Ms. Bravo that once during a bath, Ocean poked his penis with her finger out of curiosity, and he had Ms. Bravo bathe with her from then on.

In May 2016, Ocean, who was just turning five, told Ms. Bravo she had played a game with a seven-year-old girl in the neighborhood called "kiss each other's privacy."[3] Ms. Bravo responded, "[T]hat sounds kind of yucky, doesn't it?"[4] Ocean told Ms. Bravo the girl had kissed her "private" with a closed mouth and she had kissed the girl's "backside."[5] She said she was scared the girl would be mad at her for telling because the girl had made her promise not to tell anyone.

In August 2016, Appellant and Ms. Bravo, unable to resolve their differences, decided to separate. Their separation agreement granted custody of the children to Ms. Bravo and visitation rights to Appellant. Ms. Bravo then moved with the children to Texas, while Appellant remained in Hawaii and stayed in contact with them via phone and video-teleconference.

In Texas, Ocean began acting rude and angry toward Ms. Bravo, blaming her for breaking up the family and telling her she missed Appellant and was concerned about him going to jail again. Ms. Bravo explained that Appellant knew he had made a horrible mistake when he assaulted her and had to go to

---

[3] App. Ex. LI.

[4] *Id.*

[5] *Id.*

jail. Ocean told her she hated the family picture that did not have Appellant in it and threw tantrums during which she said she wanted to be with Appellant.

In September 2016, Ms. Bravo took Ocean to see a child therapist, Ms. Bailey, to address her prolonged tantrums and other behavioral issues. Ocean had begun receiving therapy for similar issues in Hawaii, and Appellant supported her continuing to see a therapist in Texas. Ms. Bravo told Ms. Bailey about the "privacy game" Ocean had played the previous May with her seven-year-old neighbor. At Ms. Bailey's suggestion, Ms. Bravo asked Ocean if anyone had ever touched her inappropriately and went over with her who was allowed to touch her and for what reasons. Consistent with Ms. Bailey's advice, Ms. Bravo asked these questions in a general way that did not suggest or refer to anyone in particular, including Appellant. Ocean "responded with what [Ms. Bravo] expected her to respond"[6] and made no allegations against Appellant.

## A. Ocean's Allegations

In early February 2017, after Ocean had trouble sleeping and began having a tantrum, Ms. Bravo spanked her so hard that she applied an ice pack to Ocean's bottom afterwards. As she did so, Ocean told her the spanking reminded her that Appellant was not there. Ms. Bravo then asked Ocean again about whether she had played any "privacy games," but this time, against Ms. Bailey's advice, she asked specifically if there were "any secrets that [she] and [Appellant] had or any games that [they] played that [Ms. Bravo] didn't know."[7] In response to Ms. Bravo's questioning, Ocean alleged that Appellant had sexually abused her, which Ms. Bravo reported to Texas Child Welfare Services. The case was then forwarded to Child Protective Services in Hawaii, where local law enforcement and the Naval Criminal Investigative Service [NCIS] were notified and opened investigations.

### 1. First Forensic Interview

A week later, in mid-February 2017, Ocean was interviewed by a forensic interviewer, Ms. Charlie. Ocean told Ms. Charlie that when she was five Appellant had her "touch his ding-ding [penis] and play with it for a long

---

[6] R. at 553.

[7] R. at 555.

time."[8] She said it was "poking out" and Appellant was holding her arm and telling her to keep going because it felt good.[9] She said she felt "slimy stuff" on her finger and "there was a little bit of white stuff."[10] She said she tried to wipe off the slimy, wet stuff but Appellant told her to put her finger on her mouth. She then said Ms. Bravo walked in and "saw [her] doing this to [Appellant's] ding-ding," said "Stop," and told Appellant, "Go somewhere else and don't get by my kids again."[11]

Ocean also told Ms. Charlie that once, when Appellant was wiping her after she went to the toilet, he "dug his finger in" her "butt" to make sure there was "no more poop coming out."[12] She said that on another occasion Appellant opened and wiped her vagina with a wipe while she was sitting on the toilet "to make sure there [were] no more drips coming out . . . so [her] tutu [vulva] [did] not burn," which she said hurt and felt weird.[13]

When asked, "Was there ever a time something different happened with your dad?" Ocean responded, "No." When asked, "Was there ever a time something like the stuff we've been talking about happened to you with someone else?" Ocean responded, "No, only to me."[14]

### 2. Drawing in Therapist's Office

Ocean's therapist, Ms. Bailey, did not ask Ocean about her allegations; however, during a therapy session in April 2017, Ocean drew a picture of her family members at their old house in Hawaii. She told Ms. Bailey that in the picture, she was in the bathroom waiting for Appellant to come wipe her.[15] At the bottom of the picture Ocean wrote, "he did hrt me! He stuck his fingr in me! It hrt. I told him no trespassing but he did it!"[16]

---

[8] Pros. Ex. 10; App. Ex. LIX at 9.

[9] Pros. Ex. 10; App. Ex. LIX at 12.

[10] *Id.*

[11] Pros. Ex. 10; App. Ex. LIX at 14. Ms. Bravo in her trial testimony denied doing or saying this. R. at 951–55.

[12] Pros. Ex. 10; App. Ex. LIX at 18.

[13] Pros. Ex. 10; App. Ex. LIX at 18–19.

[14] Pros. Ex. 10; App. Ex. LIX at 21.

[15] R. at 1056–57.

[16] Pros. Ex. 1 at 1.

### 3. Statements During Forensic Medical Examination

In August 2017, Ocean, then six years old, was examined at a children's medical center pursuant to its "physical and sexual abuse medical protocol."[17] In taking a history from Ocean, the examining nurse, Ms. Williams, asked "had anybody made [her] feel uncomfortable or touched [her] in a way that made [her] uncomfortable?"[18] Ocean said that while at home Appellant "did this little piggy then did this," pointing to her genitalia, and "it hurt."[19] When asked whether this was on top of her clothes or under her clothes, Ocean said that "it was inside, but sometimes on top, under [her] panties."[20] She said that "[w]hen [she] did poop, he digged really far down there . . . when he was wiping [her]."[21] She also said that "he made me kiss his ding-ding, his private" (penis).[22] She said, "He scraped his private with his finger and made me kiss it" and there was something "slimy" and "[she] had to eat a little bit."[23] When asked "how many times did this happen to you," she said "19 or 20 times."[24] She also said Appellant "was always saying don't tell your mother. He told me I would get a spanking or something."[25]

### 4. Second Forensic Interview

In June 2018, Ocean, then seven years old, was forensically interviewed a second time by Ms. Charlie. This time, when asked about Appellant, Ocean said he did "this little piggy" and "when he went wee, wee all the way home, he touched it and then he went . . . in this part and it hurt[ ]."[26] When Ms. Charlie asked, "What do you call that part, because I don't want to misunderstand?" Ocean responded, "Abusing."[27] Subsequently, Ocean said she had been having discussions with Ms. Kilo, a therapist working down the

---

[17] Pros. Ex. 2 at 1.

[18] R. at 516.

[19] R. at 515–16; Pros. Ex. 2 at 2.

[20] *Id.*

[21] R. at 517; Pros. Ex. 2 at 2.

[22] *Id.*

[23] R. at 517–19; Pros. Ex. 2 at 2.

[24] R. at 519; Pros. Ex. 2 at 2.

[25] R. at 517; Pros. Ex. 2 at 2.

[26] Pros. Ex. 11; App. Ex. LX at 5.

[27] Pros. Ex. 11; App. Ex. LX at 5–6.

hall from Ms. Charlie, "who taught [her] about abuse and what [Appellant] did to [her] and what's wrong and what's right."[28]

Ocean said the "little piggy" incident occurred when she was sitting on her parents' bed in Hawaii and that Appellant "went on [her] side and then he digged and then he went down there," meaning the part she uses "to pee."[29] She said he used four fingers and "poked" inside "her private" and it "hurted really bad."[30]

Ocean said that on another occasion she and Appellant were next to the wall by the towels in the bathroom, and she saw "his private part."[31] She said she saw "green stuff coming out of it" and he told her to put her finger on the green stuff and "forced [her] hand to put it in [her] mouth" and "made [her] suck on it.[32] She said it "tasted like somebody ate throw up or something."[33]

When asked "was there ever a time something different happened with [Appellant]," Ocean said, "Not that I remember like—but I feel like there's one more thing but I can't remember."[34] When Ms. Charlie later asked, "Did [Appellant] ever put his mouth on any part of your body?" Ocean first said, "No," and then said, "Actually I—that was the part that I forgot. Once he put his mouth on this part right here" and she pointed to her vaginal area.[35] She said he pulled her panties to the side and "put his mouth down there" on the part she pees from and "licked it . . . with his tongue," and "it felt gross."[36]

When asked, "Was there ever a time anyone else asked to see any private parts of your body," Ocean responded, "No."[37] When asked, "Was there ever a

---

[28] Pros. Ex. 11; App. Ex. LX at 22.

[29] Pros. Ex. 11; App. Ex. LX at 7.

[30] Pros. Ex. 11; App. Ex. LX at 8–9.

[31] Pros. Ex. 11; App. Ex. LX at 12.

[32] Pros. Ex. 11; App. Ex. LX at 12–14.

[33] Pros. Ex. 11; App. Ex. LX at 14.

[34] Pros. Ex. 11; App. Ex. LX at 15.

[35] Pros. Ex. 11; App. Ex. LX at 18.

[36] Pros. Ex. 11; App. Ex. LX at 19.

[37] Pros. Ex. 11; App. Ex. LX at 23.

time someone else ever touched any private parts of your body?" Ocean responded, "No."[38]

### 5. *Trial Testimony*

In February 2020, Ocean, then eight years old, testified at Appellant's trial. She said she touched Appellant's "ding-ding" with her finger "[o]nce" after Appellant told her to "stick" her finger on it, held her arm, and said, "Keep doing it, it feels good."[39] She said it was "sticking out"; that when she touched it she felt a little bit of goo that was "kind of, like, clear"; that he told her to put it on her lip; and that it felt "really gross" but she did not taste it.[40] She said that on another occasion in the family home in Hawaii, she was playing "this little piggy" with Appellant, and when he went "wee wee all the way home," instead of tickling her like they normally did, he put his finger in her "tutu," which "hurt really bad."[41] She denied that Appellant ever put his mouth on her "tutu" or ever kissed her anywhere but on her face.[42]

## B. Appellant's Statements

In February 2017, after learning of the operational message his command had sent out regarding Ocean's allegations, Appellant texted Ms. Bravo that he was being brought in by NCIS for questioning and denied ever touching the children inappropriately. When interviewed by NCIS, Appellant waived his rights, denied sexually abusing Ocean, and consented to a search of his home and his digital media.

At trial, Appellant testified in his defense and denied the allegations. He described his troubled relationship with Ms. Bravo and his care for the children. He said he touched Ocean's vagina and bottom while wiping her with wipes after she used the toilet and while spanking her and bathing her, not for purposes of sexual gratification. He said that Ocean once poked his penis with her finger during a bath, after which he had Ms. Bravo bathe her.

Additional facts necessary to resolve the AOEs are addressed below.

---

[38] *Id.*

[39] R. at 441–44.

[40] *Id.*

[41] R. at 447.

[42] R. at 448.

## II. DISCUSSION

### A. Admission of Evidence under the Residual Hearsay Rule

After Ocean testified that Appellant had never put his mouth on her "tutu" or kissed her anywhere but on her face, the trial counsel asked her, "When you spoke to [the forensic interviewer, Ms. Charlie] and told her everything that happened to you, do you remember everything that happened to you as you sit here today?"[43] Ocean responded, "I don't remember everything, but I remember most of it."[44]

That evening the Government informed the Defense of its intent to introduce Ocean's videotaped forensic interviews into evidence. The following morning the Defense objected to the evidence on grounds of hearsay and lack of notice. After hearing argument, the military judge informed the parties she intended to allow the videotaped interviews to be admitted under the residual hearsay exception, Mil. R. Evid. 807. The Defense orally moved for a 23-hour continuance to consider how to respond to the evidence. The military judge granted two hours and 45 minutes. The Defense then moved in writing for a five-day continuance to adjust its trial strategy, file a written motion to exclude the forensic interviews under the residual hearsay rule, and prepare with its expert to cross-examine the forensic interviewer. The Defense noted it had made a tactical decision not to cross-examine Ocean, to avoid opening the door to introduction of the videotaped interviews. The military judge denied the continuance request and, without any indication of having reviewed either exhibit prior to ruling, admitted both videotaped interviews (Prosecution Exhibits 10 and 11) in their entirety under Mil. R. Evid. 807.

Appellant asserts the military judge erred in admitting Prosecution Exhibits 10 and 11. We review a ruling to admit or exclude evidence for an abuse of discretion.[45] A military judge has "considerable discretion in admitting evidence as residual hearsay."[46] "The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion. The challenged action must be arbitrary, fanciful, clearly unreasonable, or clearly

---

[43] R. at 449.

[44] *Id.*

[45] *United States v. Solomon*, 72 M.J. 176, 179 (C.A.A.F. 2013); *United States v. Czachorowski*, 66 M.J. 432, 434 (C.A.A.F. 2008).

[46] *United States v. Donaldson*, 58 M.J. 477, 488 (C.A.A.F. 2003).

erroneous."[47] "Findings of fact are affirmed unless they are clearly erroneous; conclusions of law are reviewed de novo."[48] It is an abuse of discretion if the military judge (1) "predicates [her] ruling on findings of fact that are not supported by the evidence," (2) "uses incorrect legal principles," (3) "applies correct legal principles to the facts in a way that is clearly unreasonable," or (4) "fails to consider important facts."[49]

### 1. Notice

As an initial matter, Appellant argues the Government failed to give the required pretrial notice of its intent to offer the videotaped interviews. A statement may be admitted under the residual hearsay exception "only if, before the trial or hearing, the proponent gives an adverse party reasonable notice of *the intent to offer the statement* and its particulars, including the declarant's name and address, so that the party has a fair opportunity to meet it."[50] On its face, this language appears to require notice of both the statement itself and the party's intent to offer it into evidence. However, our superior court in *United States v. Czachorowski*, noting a split among Article III courts on this issue, construed the rule's language to require only "(1) advance notice (2) *of the statements* (3) to allow the adverse party to challenge the statements' admission and substance."[51] In other words, the court held the notice requirement "applies to the statements, not to the means by which the proponent intends to seek admission of those statements."[52]

The military judge admonished the Government for failing to give notice of its intent to offer the videotaped interviews prior to trial so that the matter could have been litigated before seating members; however, she concluded the rule's notice requirement was met under *Czachorowski*.[53] She found the Defense had received the videotaped forensic interviews in discovery almost a year prior to trial, had been provided an expert to assist in evaluating them, and had received notice of the Government's trial witnesses, which included

---

[47] *United States v. White*, 69 M.J. 236, 239 (C.A.A.F. 2010).

[48] *Czachorowski*, 66 M.J. at 434.

[49] *United States v. Commisso,* 76 M.J. 315, 321 (C.A.A.F. 2017) (citations omitted).

[50] Mil. R. Evid. 807(b) (emphasis added).

[51] *Czachorowski*, 66 M.J. at 435 (emphasis added).

[52] *Id.*

[53] R. at 632, 645.

the forensic interviewer. Thus, despite the Government's lack of pretrial notice of its intent to offer the videotaped interviews at trial, she concluded the Defense had received "more than a fair opportunity to prepare in advance of trial to confront these statements and to consider the matter that they may be admitted into this court."[54]

We find the military judge's conclusion consistent with the intentionally "flexible" notice requirement adopted in *Czachorowski*.[55] But we note that in *Czachorowski*, the trial defense counsel "admitted that he had known about the statement, and *trial counsel's intent to seek admission of those statements*, since the case's inception."[56] We therefore reject the Government's contention during oral argument that the *Czachorowski* test was satisfied by the mere disclosure of the videotaped interviews to the Defense during pretrial discovery. Here, however, Appellant had not only received the evidence, but had also been granted a forensic psychologist specifically to "prepare and address the testimony and interviews—forensic or otherwise—of the alleged victims in this case."[57] Thus, the Defense was sufficiently in a position "to challenge the statements' admission and substance"[58] when the Government announced its intent to offer them after Ocean's in-court testimony.

### 2. Analysis of the Military Judge's Admissibility Ruling

The residual hearsay exception is intended to "be used very rarely and only in exceptional circumstances."[59] It allows for the admission of otherwise excludable hearsay statements, even if not specifically covered by another hearsay exception, provided the following conditions are met:

> (1) the statement has equivalent circumstantial guarantees of trustworthiness;

> (2) it is offered as evidence of a material fact;

---

[54] R. at 646.

[55] *Czachorowski*, 66 M.J. at 435.

[56] *Id.* at 434 (emphasis added).

[57] App. Ex. XVI at 7.

[58] *Czachorowski*, 66 M.J. at 435.

[59] *Id.* at 435 n.6 (quoting S. Rep. No. 1277 (1974), *as reprinted in* 1974 U.S.C.C.A.N. 7051, 7066).

(3) it is more probative on the point for which it is offered
than any other evidence that the proponent can obtain through
reasonable efforts; and

(4) admitting it will best serve the purposes of these rules
and the interests of justice.[60]

Our superior court has summarized these requirements as "(1) materiality,
(2) necessity, and (3) reliability."[61]

Materiality "is a multi-factored test looking at the importance of the issue
for which the evidence was offered in relation to the other issues in this case;
the extent to which the issue is in dispute; and the nature of the other
evidence in the case pertaining to th[at] issue."[62]

The necessity prong "essentially creates a best evidence requirement,"
albeit one applied more liberally to the statements of child victims relating
the details of abusive events.[63] "This prong may be satisfied where a witness
cannot remember or refuses to testify about a material fact and there is no
other more probative evidence of that fact."[64] While residual hearsay may be
"somewhat cumulative, it may be important in evaluating other evidence and
arriving at the truth so that the 'more probative' requirement cannot be
interpreted with cast iron rigidity."[65]

Reliability is determined through the weighing of "particularized guaran-
tees of trustworthiness . . . drawn from the totality of circumstances that
surround the making of the statement and that render the declarant
particularly worthy of belief."[66] These include such factors as the age and
mental state of the declarant; the spontaneity and repetition of the state-
ment; the circumstances under which the statement was made; whether
suggestive questioning was used; the use of terminology unexpected of a child

---

[60] Mil. R. Evid. 807(a).

[61] *United States v. Kelley*, 45 M.J. 275, 280 (C.A.A.F. 1996) (citations omitted).

[62] *United States v. Ellerbrock*, 70 M.J. 314, 318 (C.A.A.F. 2011) (citations and
internal quotation marks omitted).

[63] *Kelley*, 45 M.J. at 280–81 (citations omitted).

[64] *United States v. Wellington*, 58 M.J. 420, 425 (C.A.A.F. 2003) (citations omit-
ted).

[65] *Kelley*, 45 M.J. at 280 (quoting *United States v. Shaw*, 824 F.2d 601, 610 (8th
Cir. 1987)).

[66] *Idaho v. Wright*, 497 U.S. 805, 820 (1990).

of similar age; the lack of motive to fabricate; and whether the statement is corroborated by other evidence.[67]

Here, after the Government announced its intent to offer the videotaped interviews, the Defense objected, and the military judge heard argument on the objection. She then informed the parties that she anticipated the residual hearsay factors would be satisfied and that she would allow the Government to elicit foundational testimony from the forensic interviewer. When the Defense requested that the military judge review the videos during a long recess prior to ruling on their admissibility, the trial counsel responded that "the court's already ruled as to what foundation we need to lay. . . . I don't know that the content of the videos is determinative of that."[68] After the recess, the Defense moved for a continuance and an evidentiary hearing to litigate whether the interviews were admissible under the residual hearsay rule.[69] Among other things, the Defense argued that:

> the court must watch the videos before making that determina-
> tion. We would even like to be able to take clips of those videos
> and be able to point those things out. We just haven't had the
> time in the close to three hours that we've had since we broke
> last to be able to point out those areas where the Defense
> would challenge those circumstantial guarantees of trustwor-
> thiness that I believe the Government would be trying to point
> out.[70]

The military judge denied the Defense requests. She made a preliminary ruling based principally on what she had observed during Ocean's in-court testimony,[71] conditioned it on the Government eliciting appropriate foundational testimony from the forensic interviewer, and subsequently admitted both videotaped interviews in their entirety. She did so without actually watching the interviews.

---

[67] *Wright*, 497 U.S. at 821–22; *United States v. Donaldson*, 58 M.J. 477, 488 (C.A.A.F. 2003); *United States v. McGrath*, 39 M.J. 158, 166–67 (C.M.A. 1994).

[68] R. at 638.

[69] App. Ex. LII; R. at 638-43.

[70] R. at 641.

[71] The military judge found that during her testimony Ocean appeared articulate, was not crying, and was not overly emotional; that her answers were short; and that she kept strict eye contact with her Article 6(b) representative, who was placed in a position in the gallery to ensure that she could testify fully. R. at 649.

The only findings the military judge made as to the contents of the videos—the actual out-of-court statements sought to be admitted—were essentially educated guesses as opposed to factual findings. She determined the interviews were material because they "included, what the court understands, are the victim's statements concerning the accused's sexual abuse of her as charged by the Government."[72] Regarding their necessity, she found the interviews were "likely to be more probative" than Ocean's in-court testimony because Ocean "testified to fewer offenses and in less detail than what is expected to be shown in [the] forensic interviews."[73] Regarding their reliability, she stated that she "expect[ed] the forensic interviews to show that [Ocean's] statements were made in a safe environment specifically made for children to make them comfortable . . . [and] anticipate[d] that the statements were taken by a professional who is trained to speak to children and to avoid suggestibility or argument."[74]

For several reasons, we conclude that the military judge abused her discretion by ruling in this manner on the admissibility of the statements under the residual hearsay rule. First, the military judge's analysis of the content and context of the statements themselves was ultimately grounded on speculative assumptions about what the videos contained, as opposed to being predicated on actual findings of fact supported by the evidence.

Second, addressing the statements' admissibility in this manner resulted in her application of the various prongs of the residual hearsay rule to the "facts" in a way that is clearly unreasonable. In determining the statements' necessity, for example, the military judge made factual findings about Ocean's demeanor and testimony during trial and heard foundational testimony from the forensic interviewer about her training and interview protocols. But without factual findings based on a review of the interviews themselves, the military judge had no basis upon which to conclude as a matter of law that Ocean's statements during the interviews were actually "more probative on the point for which [they were] offered than any other evidence that the proponent [could] obtain through reasonable efforts."[75] A military judge cannot possibly weigh the probative value of out-of-court

---

[72] R. at 648.

[73] R. at 649.

[74] R. at 650.

[75] Mil. R. Evid. 807(a)(3).

statements vis-à-vis in-court testimony (or other evidence) without knowing, and addressing, what those statements actually are.

Third, in ruling in this manner on the admissibility of the statements, the military judge failed to consider important facts—namely, what Ocean actually said during each interview. The contours of what makes a fact "important" enough to constitute an abuse of discretion if not "considered" are not clearly defined.[76] But it is difficult to imagine facts more important to consider in an admissibility analysis under the residual hearsay rule than the content of the statements sought to be introduced. To assess their reliability, for example, the statements must be analyzed for *particularized* guarantees of trustworthiness, based on the totality of the circumstances under which they were made. Here, statements made during two interviews conducted over 14 months apart were addressed collectively for, at best, generalized guarantees of trustworthiness based on the forensic interviewer's testimony about how she conducted the interviews. The military judge's analysis did not take into account such critical, material facts as what Ocean actually stated during each interview, whether she used any terminology unexpected of a child of similar age, whether there appeared to be suggestibility concerns during either interview, or whether her statements during the two interviews were corroborated by other evidence or even by each other.

The failure to give individualized consideration to each interview—let alone the statements within each interview—led the military judge to overlook significant issues that affect the analysis under the residual hearsay rule. While the necessity prong is generally applied more liberally to statements of child victims, it is nevertheless true that "the direct testimony of the hearsay declarant ordinarily would be judged the most probative evidence."[77] Here, the general similarities between what Ocean alleged

---

[76] *Compare Commisso*, 76 M.J. at 317–18, 323 (finding abuse of discretion in denial of mistrial motion on grounds of member bias where military judge did not address panel member's statements indicating bias and three panel members' attendance at Sexual Assault Review Board meetings discussing victim's allegations); *and Solomon*, 72 M.J. at 180 (finding abuse of discretion in admission of evidence under Mil. R. Evid. 413 where military judge did not reconcile or mention a police report showing the accused was in custody at time of alleged assaults and gave little or no weight to his prior acquittal of the offenses); *with United States v. Becker*, No. 21-0236, ___ M.J. ___, 2021 CAAF LEXIS 844 (C.A.A.F. Sept. 14, 2021) (finding no abuse of discretion in denial of motion to admit statements under forfeiture by wrongdoing where military judge did not address immediate circumstances and premeditated manner of accused's alleged murder of declarant).

[77] *Czachorowski*, 66 M.J. at 436.

during the first interview and what she testified to at trial highlight the lack of any reasoned basis for the military judge's speculative assumption that the forensic interviews were "likely to be more probative" than Ocean's in-court testimony.

More concerning is the military judge's failure to address *particularized* guarantees of trustworthiness, especially with respect to the second interview. There, Ocean changed her statements about Appellant wiping her in the bathroom after she used the toilet into an allegation that he digitally penetrated her on a bed; she alleged for the first time that he had put his mouth on her vaginal area, while failing to disclose when asked that someone else (her neighbor) had touched her private parts in this manner; she used adult terminology to describe Appellant's alleged conduct as "abusing"; and she referred to discussions she had been having with a therapist working down the hall from the forensic interviewer "who taught [her] about abuse and what [Appellant] did to [her] and what's wrong and what's right."[78] These facts dramatically impact the analysis as to whether Ocean's statements during the second interview are sufficiently reliable to be admitted under Mil. R. Evid. 807, and none would be apparent without reviewing, and addressing, the videotaped interview itself.

Applying the appropriate deference to her ruling, we find that the military judge's failure to address or reconcile the contents of the videotaped interviews or give due weight to the statements Ocean made therein, for which admission was sought, undermined her analysis under the residual hearsay rule such that the decision to admit Prosecution Exhibits 10 and 11 was an abuse of discretion.[79]

### 3. Prejudice

Having found error, we test for prejudice. Appellant argues the error is constitutional because admission of the exhibits after Ocean's testimony deprived him of his constitutional rights. We disagree, and find Appellant's rights to confrontation and due process were satisfied when Ocean testified and thereafter remained subject to recall for further examination by either party during the trial, including the Defense.[80] For non-constitutional

---

[78] Pros. Ex. 11; App. Ex. LX at 22.

[79] *See Solomon*, 72 M.J. at 182.

[80] *See United States v. Deland*, 22 M.J. 70, 72 (C.M.A. 1986) (finding that where the alleged victim "testified at the trial and could be observed by the trier of fact . . . the reception of her extrajudicial statement did not violate appellant's sixth

evidentiary errors, the test for prejudice "is whether the error had a substantial influence on the findings."[81] In conducting this analysis, we weigh "(1) the strength of the Government's case, (2) the strength of the defense case, (3) the materiality of the evidence in question, and (4) the quality of the evidence in question."[82]

With respect to Specification 2 of Charge I, Prosecution Exhibit 11 is the only evidence supporting the allegation that Appellant penetrated Ocean's vulva with his mouth, which Ocean denied during her in-court testimony and did not mention in her other out-of-court statements that were admitted at trial. At oral argument, the Government conceded that if the Court found Prosecution Exhibit 11 was erroneously admitted, the error would be prejudicial with respect to Appellant' conviction of this specification. We agree, and conclude the erroneous admission of this evidence necessitates setting aside the finding of guilty for Specification 2 of Charge I, which we accomplish in our decretal paragraph.

In weighing the above factors with respect to Appellant's other convictions for Specification 3 (penetrating Ocean's vulva with his finger) and Specification 6 (causing her to touch his genitalia) of Charge I, we reach the opposite conclusion. The Government's case with respect to these specifications was not strong, as it rested essentially on Ocean's testimony and out-of-court statements, with additional evidence bearing on Appellant's credibility, intent, and consciousness of guilt.[83] The Defense case was not strong either, consisting principally of Appellant testifying about his difficult relationship

---

amendment right of confrontation") (citing *United States v. LeMere*, 22 M.J. 61 (C.M.A. 1986); *California v. Green*, 399 U.S. 149 (1970)). *Cf. United States v. Gardinier*, 67 M.J. 304, 305–07 (C.A.A.F. 2009) (using constitutional standard to test for prejudice where trial judge admitted child victim's out-of-court statements in violation of the appellant's confrontation right after determining she was not available to testify at trial).

[81] *United States v. Kohlbek*, 78 M.J. 326, 334 (C.A.A.F. 2019) (internal quotation marks and citation omitted).

[82] *Id.* (quoting *United States v. Norman*, 74 M.J. 144, 150 (C.A.A.F. 2015)).

[83] The evidence supports that Appellant would hit himself when he felt he had disappointed the family, lied about doing so, and called himself a monster during arguments with Ms. Bravo, who testified he had a sexual proclivity to have her taste his ejaculate after intercourse.

with Ms. Bravo, his care for the children which included bathing and wiping them, and his denial of Ocean's allegations.[84]

While Ocean's statements to Ms. Charlie are material these offenses, the quality of their support to the Government's case is undermined in certain respects. Ocean's statements during the first interview about touching Appellant's penis are relatively consistent with her in-court testimony; however, her claim that Ms. Bravo walked in when this occurred, said "stop," and told Appellant to "go somewhere else and don't get by my kids again" (which Ms. Bravo denied doing or saying) undermines the credibility of the allegation. Moreover, Ocean's statements about digital penetration during this interview place the activity in the context of Appellant wiping her in the bathroom after she used the toilet,[85] which supports Appellant's parental-care defense and undermines her claim during the second interview that Appellant penetrated her with four fingers on her parents' bed. Similarly, Ocean's statements during the second interview about touching Appellant's penis are inconsistent and more exaggerated in comparison with both the first interview and her trial testimony, which also undermines her credibility.

Accordingly, we conclude the erroneous admission of the videotaped interviews alone did not have a substantial influence on the guilty findings for Specifications 3 and 6 of Charge I.

## B. Denial of Defense Motion under Mil. R. Evid. 412

During the Government's opening statement, the trial counsel told the members:

> We invite you to listen to how [Ocean] describes these acts, what words she uses, how it happened, how it felt. Because when you hear how she describes it in her own words, it will allow you to understand that *what she is describing are things she actually experienced.*[86]

In response, during his opening statement, Appellant's civilian defense counsel [CDC] began to discuss the game of "kiss each other's privacy" in

---

[84] The Defense also called several character witnesses who opined that Appellant was a truthful person, despite not knowing about asserted instances of his dishonesty.

[85] Ocean's drawing and statements to her therapist, Ms. Bailey, also place the allegation in this context.

[86] R. at 402 (emphasis added).

which Ocean had experienced her seven-year-old neighbor putting her mouth on Ocean's "private." The Government objected and asserted lack of notice under Mil. R. Evid. 412. During the Article 39(a) session, CDC argued the Defense should be allowed to rebut the Government's position that "the only place that [Ocean] could learn this from is [Appellant]. The Defense has to be able to show there's another source for this information that's coming out. It is not [Mil. R. Evid.] 412, it is [Mil. R. Evid.] 608."[87]

The military judge found the evidence was covered by Mil. R. Evid. 412, the issue had not been litigated, and the required notice under the rule had not been given. She sustained the Government's objection and instructed the Defense not to mention the issue further.

Subsequently, the Defense moved the court to allow it to elicit the "privacy game" evidence during its cross-examination of Ms. Bravo, who testified about reporting Ocean's allegations to the authorities and then taking her to be forensically interviewed. CDC argued the evidence that the neighbor had placed her lips/mouth on Ocean's private parts was constitutionally required under Mil. R. Evid. 412 because it would rebut the impression left by the Government "that the only way that [Ocean] learned about this information is through experiences exclusively with [Appellant]."[88] Rather, it would show that Ocean's behavior "could have been learned from an outside source. . . . Because, otherwise, [the members would] go back to the deliberation room and say, 'Where else could she have learned this? Where else would a 5-, 6-, 7-, 8-year-old learn this?'"[89]

The military judge denied the motion, concluding that it was untimely and the Defense had "not articulated a theory of relevance that place[d] it into the constitutional realm."[90] She found there was no impression left with the members that the only place Ocean could have learned the behavior was from Appellant, and that the Defense was not arguing it was relevant to Ocean's credibility.

The Government then introduced into evidence, over Defense objection, the videotaped forensic interviews (Prosecution Exhibits 10 and 11) and published them in open court. During the second interview, Ocean made the

---

[87] R. at 423.

[88] R. at 596.

[89] R. at 597.

[90] R. at 608.

new allegation that Appellant had put his mouth on the part she pees from and said that "it felt gross."[91] When subsequently asked during the same interview, "Was there ever a time anyone else asked to see any private parts of your body," Ocean responded, "No."[92] When asked, "Was there ever a time someone else [other than Appellant] ever touched any private parts of your body?" Ocean again responded, "No."[93]

In conjunction with introducing this evidence, the Government elicited testimony from the forensic interviewer, Ms. Charlie, that an aspect of conducting forensic interviews is "to explore alternative hypotheses," to find out whether the alleged behavior has "ever happened to [the child] with someone else."[94] Following that, the Government elicited testimony from its expert in forensic interviewing, Dr. Foxtrot, that such alternative hypotheses

> are important, in my view, to explore sources of a child's knowledge. So if a child did provide information that suggested exposure from other sources, that would be information about the sources of a child's knowledge, and it might impact upon how somebody examined, you know, why they know what they know, where is it coming from. So, I mean, that is the basis of, in part, of why we ask those questions. It is, also, to screen for additional forms of maltreatment, but it is also just to understand, why does a five-year-old know something, or where is that coming from.[95]

In light of this additional evidence, CDC moved the military judge to reconsider her previous Mil. R. Evid. 412 ruling. He argued there was good cause under the rule's constitutional exception to question Dr. Foxtrot about the alternative hypothesis that Ocean had gained the experiential knowledge of having someone's mouth placed on her vaginal area not from Appellant, but from her seven-year-old neighbor. He argued that "if in this case there was an external influence or external game where this individual could have

---

[91] Pros. Ex. 11; App. Ex. LX at 19.

[92] Pros. Ex. 11; App. Ex. LX at 23.

[93] *Id.*

[94] R. at 1116.

[95] R. at 1189.

learned about the behavior from someone else, that could influence what was done in the interview."[96]

He also argued the evidence was admissible under Mil. R. Evid. 608 because it contradicted Ocean's statements during the interviews that left a false impression that no one else had ever inappropriately touched her—specifically, by placing their mouth on her private parts. He argued that Ms. Charlie's testimony suggested it was important "to eliminate the possibility that this otherwise abnormal behavior, not typically known by a five-year-old, could have been learned only from the accused in this particular case."[97] Because the Defense had been precluded from eliciting the evidence from other witnesses pursuant to the court's earlier Mil. R. Evid. 412 ruling, he argued he should be allowed to explore the issue with Dr. Foxtrot who emphasized the importance of exploring alternative hypotheses "in the context of the forensic interview. They must know why the child knows what they know, and they must know where that information has come from."[98]

The military judge denied the motion for reconsideration. Adopting her prior ruling, she concluded the evidence was not constitutionally required because it was not "relevant to the issues that are before the members," which she found concerned "the issue of suggestibility, not learned behavior."[99] She further found the evidence was "not material or important to the issue for which the evidence is offered in relation to other issues in the case, the other evidence that the Defense has and has been able to present to the members."[100]

Appellant asserts the military judge erred in denying the Defense's motion to admit this evidence under Mil. R. Evid. 412. We review rulings to admit or exclude evidence for an abuse of discretion.[101]

### 1. Law

"Evidence offered to prove an alleged victim engaged in other sexual behavior" is, with limited exceptions, generally not admissible at a trial

---

[96] R. at 1202.

[97] R. at 1203–04.

[98] R. at 1206.

[99] R. at 1207.

[100] *Id.*

[101] *Ellerbrock*, 70 M.J. at 317.

involving a sexual offense.[102] A party intending to offer such evidence under an exception to this rule must "file a written motion at least 5 days prior to entry of pleas specifically describing the evidence and stating the purpose for which it is offered unless the military judge, for good cause shown, requires a different time for filing or permits filing during trial."[103] If after a hearing the military judge determines that the evidence falls within an exception to this rule and the probative value of the evidence outweighs the danger of unfair prejudice to the alleged victim's privacy, the evidence is admissible subject to any parameters specified by the military judge and the Mil. R. Evid. 403 balancing test.[104]

One of the rule's exceptions is for "evidence the exclusion of which would violate the accused's constitutional rights."[105] This exception encompasses an accused's Sixth Amendment right to confront and cross-examine the witnesses against him, which includes the right "to impeach, i.e., discredit the witness."[106] Evidence, provided it passes the Mil. R. Evid. 403 balancing test, is admissible under this exception if it is relevant, material, and favorable (i.e., "vital") to the defense, no matter how embarrassing it may be to the alleged victim.[107] Evidence is relevant if it has any tendency to make a fact of consequence in determining the action more or less probable than it would be without the evidence.[108] Materiality "is a multi-factored test looking at the importance of the issue for which the evidence was offered in relation to the other issues in this case; the extent to which the issue is in dispute; and the nature of the other evidence in the case pertaining to th[at] issue."[109] To pass the Mil. R. Evid. 403 balancing test, the evidence's probative value must not be substantially outweighed by such dangers as "harassment,

---

[102] Mil. R. Evid. 412(a)(1). "Sexual behavior" includes "any sexual behavior not encompassed by the alleged offense." Mil. R. Evid. 412(d).

[103] Mil. R. Evid. 412(c)(1)(A).

[104] Mil. R. Evid. 412(c).

[105] Mil. R. Evid. 412(b)(3).

[106] *Ellerbrock*, 70 M.J. at 318 (quoting *Olden v. Kentucky*, 488 U.S. 227, 231 (1988)).

[107] *United States v. Banker*, 60 M.J. 216, 222–23 (2004), *abrogated by United States v. Gaddis*, 70 M.J. 248, 256 (C.A.A.F. 2011).

[108] Mil. R. Evid. 401.

[109] *Ellerbrock*, 70 M.J. at 318 (citations and internal quotation marks omitted).

prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant."[110]

For specific instances of conduct as it relates to a witness' character for truthfulness, Mil. R. Evid. 608(b) provides that "the military judge may, on cross-examination, allow [such instances] to be inquired into if they are probative of the character for truthfulness or untruthfulness" of the witness.[111] Extrinsic evidence "is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness."[112] However, the doctrine of "impeachment by contradiction," does allow "showing the tribunal the contrary of a witness' asserted fact, so as to raise an inference of general defective trustworthiness."[113]

### 2. Analysis

Just as the Government failed to give pretrial notice of its intent to admit the videotaped interviews, the Defense gave no notice under Mil. R. Evid. 412 of its intent to elicit the evidence of Ocean's "other sexual behavior": her game of "kiss each other's privacy" with her neighbor. So once again, the military judge was forced to rule on a crucial motion mid-trial, without the benefit of a pretrial evidentiary hearing or formal briefing from the parties. However, the rule grants the military judge authority to entertain such motions during trial "for good cause shown."[114] In addition, as we have previously found, the Government can through its own actions at trial open the door to Mil. R. Evid. 412 evidence that might not otherwise be admissible under the rule.[115] Specifically, if the Government creates a factual inference through its presentation of evidence, "the defense must be allowed to rebut that inference. To do otherwise denies the appellant his right to mount a defense, and allows the Government to meet its burden based on an incomplete description of events."[116]

---

[110] *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986).

[111] Mil. R. Evid. 608(b).

[112] *Id.*

[113] *United States v. Banker*, 15 M.J. 207, 210 (C.M.A. 1983).

[114] Mil. R. Evid. 412(c)(1)(A).

[115] *See United States v. Villanueva*, No. 201400212, 2015 CCA LEXIS 90 (N-M. Ct. Crim. App. Mar. 19, 2015) (unpublished).

[116] *Id.* at *9-10.

We find that is the case here. Irrespective of whether the evidence of Ocean's "privacy game" with her neighbor was relevant at the time of opening statements, it was certainly relevant by the time the Government elected to introduce and publish Ocean's second videotaped interview (Prosecution Exhibit 11), during which Ocean stated that Appellant had put his mouth on her vaginal area and subsequently denied that anyone else had ever touched or asked to see her "private parts." These statements create precisely the inference that the Defense had expressed concerns about with the Government's opening statement: that given her young age, the members would infer that the only way Ocean could have learned and been able to testify about such behavior was through Appellant's alleged misconduct.

The Government then reinforced the inference it created through Ms. Charlie's and Dr. Foxtrot's testimony about the importance of "exploring alternative hypotheses" during forensic interviews, in order to examine the sources of a child's knowledge and understand why a five-year-old knows what she knows. At the very least, this testimony implied that Ms. Charlie's interviews of Ocean were forensically sound because there were no alternative hypotheses to explore. In fact, the "privacy game" evidence suggests the opposite is true: the forensic interviews are potentially not as sound as they appear because at least one known alternative hypothesis was never explored—that Ocean's knowledge of someone putting their mouth on her vaginal area was drawn from her interaction with her neighbor. In context, that alternative hypothesis is an important one, because it could explain how Ocean acquired the knowledge and sensory experience of such behavior wholly independent of Appellant's alleged conduct.

By this time in the trial, the evidence of the "privacy game" was also relevant to Ocean's credibility. When the Government admitted Prosecution 11, it placed squarely before the members Ocean's denials that anything like what she had been describing (which included both digital penetration and oral copulation) had ever happened with anyone other than Appellant— namely, that anyone had ever touched or asked to see her "private parts."[117] These denials are directly contradicted by Ocean's statements to Ms. Bravo about the game of "kiss each other's privacy," during which her neighbor had kissed her "private" with a closed mouth and she had kissed the girl's

---

[117] Pros. Ex. 11; App. Ex. LX at 23.

"backside."[118] Because the Government's evidence (Prosecution Exhibit 11) raised this issue, the Defense was entitled to use the other evidence for impeachment by contradiction: "showing the tribunal the contrary of a witness' asserted fact, so as to raise an inference of general defective trustworthiness."[119]

As such, we find clearly erroneous the military judge's finding on the motion for reconsideration that the "privacy game" evidence was not relevant, material, or important to the issues before the members, which she found solely concerned suggestibility as opposed to learned behavior. While suggestibility was indeed an issue explored by the Defense, the issue of learned behavior, which the Government's evidence had placed in issue, had not been explored precisely because the military judge's earlier Mil. R. Evid. 412 ruling had foreclosed the Defense from doing so. We find the circularity of such analysis to be clearly unreasonable.

We also find clearly erroneous and unsupported by the evidence the military judge's determination, adopted from her prior ruling, that the Government's evidence left no impression that the only place Ocean could have learned the alleged behavior was from Appellant. Ocean's statements in Prosecution Exhibit 11 create exactly this impression, which the "privacy game" evidence reveals to be not only misleading but false. This impression was then reinforced through the forensic interviewer's and the Government expert's testimony about exploring alternative hypotheses, when there was a known alternative hypothesis which should have been but, unbeknownst to the court-martial members, was never explored. Thus, not only does the evidence of this particular alternative explanation for Ocean's knowledge color the trustworthiness of the forensic interviews, but her contradictory statements impact the overall credibility of her allegations. The evidence was

---

[118] App. Ex. LI. While the Government quibbled during oral argument about what "private" may mean, we find that in distinguishing between "private" and "backside" Ocean provided sufficient context to raise this contradiction.

[119] *Banker*, 15 M.J. at 210. While we understand such substantive impeachment may not have been accomplished through cross-examining the witness on the stand at the time of the motion for reconsideration—Ms. Foxtrot—we conclude that based on the evidence and arguments the military judge had before her at that time, her ruling foreclosed the Defense from pursuing the matter further with either the Government's witnesses or its own. *See* Mil. R. Evid. 103(b) ("Once the military judge rules definitively on the record admitting or excluding evidence, either before or at trial, a party need not renew an objection or offer of proof to preserve a claim of error for appeal.").

therefore relevant, material, and vital to Appellant's defense, and its probative value in these areas far outweighed any danger of unfair prejudice.

Applying the appropriate deference to the military judge's ruling, we conclude this evidence was of such clear importance to issues central to the trial and to Appellant's defense that excluding it as not constitutionally required was an abuse of discretion.

### 3. Prejudice

Because we conclude the evidence was constitutionally required, its exclusion is constitutional error. Consequently, "we must test the error to see if it was harmless beyond a reasonable doubt—whether there is a reasonable possibility that the evidence [or error] complained of might have contributed to the conviction."[120] We do so by applying five nonexclusive factors: "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case."[121]

We conclude the exclusion of this Mil. R. Evid. 412 evidence was not harmless. Ocean's testimony and out-of-court statements were the heart of the Government's case, which was not strong. The "privacy game" evidence was a principal means of impeaching both the reliability of the videotaped interviews and the credibility of the Government's central witness. Without question, the evidence was material to Specification 2 of Charge I, as it contradicted Ocean's statements in a way specific to her allegation in Prosecution Exhibit 11 that Appellant had put his mouth on her vulva (and no one else ever had). As, in fact, this is exactly what the excluded evidence showed the neighborhood girl had done to her—which would explain how Ocean might be both aware of and able to describe such an experience—we conclude there is a reasonable possibility that the erroneous exclusion of the evidence might have contributed to Appellant's conviction of this specification.

We further find the evidence impeaches Ocean's overall credibility in a way that impacts Appellant's other convictions. Similar to prior inconsistent statements through which, "[b]y showing self-contradiction, the witness can

---

[120] *Ellerbrock*, 70 M.J. at 320 (citations and internal quotation marks omitted).

[121] *Van Arsdall*, 475 U.S. at 684 (citations omitted).

be discredited as a person capable of error," impeachment by contradiction of a witness' asserted fact raises "an inference of general defective trustworthiness."[122] Appellant's defense was that suggestion from Ms. Bravo or others (like Ms. Kilo) had caused Ocean to turn innocuous or non-criminal conduct—bathing, wiping, even playing with a neighbor's child—into abuse allegations whose trustworthiness was generally defective. The "privacy game" evidence calls into question Ocean's statements that she had never before had anyone touch or ask to see her "private parts," which during the second interview included Appellant not only putting his mouth on her vaginal area but also digitally penetrating her vagina with four fingers on a bed (as opposed to wiping her after she used the toilet as she had previously stated). Had the court-martial members been aware of the apparent falsity of her denials that similar conduct had occurred to her outside the presence of Appellant, we find that "[a] reasonable jury might have received a significantly different impression of [Ocean's] credibility."[123] Thus, under these circumstances, we conclude there is a reasonable possibility that the erroneous exclusion of the evidence might also have contributed to Appellant's convictions of Specifications 3 and 6 of Charge I.

Accordingly, we find the error was not harmless beyond a reasonable doubt with respect to any of Appellant's convictions, which we set aside in our decretal paragraph.

## C. Admission of Evidence Under Mil. R. Evid. 803(4)

Appellant asserts the military judge erred in admitting, over his trial defense counsel's hearsay objection, both the testimony of a pediatric nurse practitioner, Ms. Williams, and an excerpt of her report (Prosecution Exhibit 2) regarding Ocean's statements to her, under the hearsay exception for statements made for medical diagnosis or treatment, Mil. R. Evid. 803(4). We review rulings to admit or exclude evidence for an abuse of discretion.[124]

Mil. R. Evid. 803(4) excludes from the rule against hearsay "[a] statement that—(A) is made for—and is reasonably pertinent to—medical diagnosis or treatment; and (B) describes medical history; past or present symptoms or sensations; their inception; or their general cause."[125] Our superior court has

---

[122] *Banker*, 15 M.J. at 210.

[123] *Ellerbrock*, 70 M.J. at 321 (citations and internal quotations omitted).

[124] *Solomon*, 72 M.J. at 179.

[125] Mil. R. Evid. 803(4).

construed this language to require two conditions to be satisfied: "first the statements must be made for the purposes of 'medical diagnosis or treatment'; and second, the patient must make the statement 'with some expectation of receiving medical benefit for the medical diagnosis or treatment that is being sought.'"[126] This test is in accordance with the exception's rationale: "the self-interested motivation to speak the truth to a treating physician . . . in order to receive proper care and the necessity of the statement for a diagnosis or treatment."[127]

### 1. Analysis

The military judge found that Ocean's statements to Ms. Williams "fit under the exception, [Mil. R. Evid.] 803(4), statements made for medical diagnosis or treatment."[128] On the exception's subjective prong, while the military judge did not make a finding as to Ocean's expectation in speaking with Ms. Williams, she did note Ms. Williams' testimony that she "informs the child that she's going to have a checkup to make sure that she's okay and everything is okay with her body."[129] "A child-victim's expectation of receiving medical treatment . . . may be established by the testimony of the treating medical professionals," as long as the record "support[s] the military judge's determination that the child had the requisite understanding and expectation of a medical benefit to satisfy the subjective prong."[130] We find the military judge's implicit finding that Ocean "had some expectation of treatment when she talked to [Ms. Williams]"[131] is supported by Ms. Williams' testimony.

---

[126] *United States v. Rodriguez-Rivera*, 63 M.J. 372, 381 (C.A.A.F. 2006) (quoting *United States v. Edens*, 31 M.J. 267, 269 (C.M.A. 1990)).

[127] *United States v. Quigley*, 35 M.J. 345, 347 (C.M.A. 1992). While the court in *Quigley* required that the statement also be made "near the pivotal time of events," *id.* at 347, the court has since analyzed Mil. R. Evid. 803(4) under the two-pronged test described above, which does not include such a temporal requirement. *Rodriguez-Rivera*, 63 M.J. at 381. We therefore disagree with Appellant's contention that the exception requires the statements to be close in time to events at issue and conclude that any lapse of time between the alleged abuse and the examination during which the statements are made is simply a factor to be used in determining whether the current two-pronged test has been satisfied.

[128] R. at 494.

[129] *Id.*

[130] *United States v. Hollis*, 57 M.J. 74, 79–80 (C.A.A.F. 2002).

[131] *Rodriguez-Rivera*, 63 M.J. at 381 (quoting *United States v. Haner*, 49 M.J. 72, 76 (C.A.A.F. 1998)).

The issue here is with the exception's objective prong—the necessity of the statements for purposes of medical diagnosis or treatment—regarding which the military judge made no specific findings. In *United States v. Gardinier*, our superior court found error in the admission of a child's statements to a sexual assault nurse examiner [SANE] during a forensic medical examination.[132] The SANE testified she took a patient history from the child regarding the alleged inappropriate touching "to determine diagnosis and treatment," but the child had already been interviewed by law enforcement, and the sheriff's department was involved in arranging the examination and, per the authorization form, received a copy of the report, which the government then introduced at trial.[133] The court found that the SANE, "who specialized in conducting forensic medical examinations, performed a forensic medical exam on [the child] at the behest of law enforcement with the forensic needs of law enforcement and prosecution in mind."[134]

Like the court in *Gardinier*, we recognize that the "referral of an alleged victim to a medical professional by law enforcement or trial counsel does not always establish that the statements at issue were made in response to a law enforcement or prosecution inquiry or elicited with an eye toward prosecution."[135] Nor does delay alone negate the possibility that an examination could be undertaken for the legitimate purposes of medical diagnosis or treatment.[136] However, our superior court has also noted that "military judges must remain vigilant in ensuring that the hearsay exception for statements made for the purposes of medical diagnosis or treatment is not used as a subterfuge."[137]

---

[132] 65 M.J. 60, 64–67 (C.A.A.F. 2007) (analyzing the issue as a violation of the appellant's confrontation right).

[133] *Id.* at 66.

[134] *Id.*

[135] *Id.* (citing *Rodriguez-Rivera*, 63 M.J. at 381).

[136] *See Rodriguez-Rivera*, 63 M.J. at 381 (upholding admission of statements under medical hearsay exception where, after being examined by a physician at an overseas Naval medical clinic, upon the family's subsequent transfer back to the United States the trial counsel arranged for the child to see a child abuse pediatrician, whose purpose in examining her was to provide a second opinion regarding the child's health and determine if she needed any further medical or psychological intervention).

[137] *Id.* at 381 n.2.

Here, six months after arranging for Ocean to be forensically interviewed, law enforcement arranged for Ocean to be examined at a children's medical center pursuant to its "physical and sexual abuse medical protocol."[138] Ms. Williams worked as part of the hospital's "child advocacy resource and evaluation team," which specialized in seeing suspected child abuse victims through referrals from law enforcement, child protective services, and other agencies.[139] The authorization form Ms. Bravo signed listed the name of the Honolulu Police Department detective assigned to the case and authorized the release of the examination report to "the appropriate law enforcement agency and the Office of the District Attorney having jurisdiction."[140] After talking to Ms. Bravo about Ocean's allegations, Ms. Williams asked Ocean "had anybody made [her] feel uncomfortable or touched [her] in a way that made [her] uncomfortable?"[141] The statements she elicited and wrote in the "patient history" section of the report contain no ongoing medical issues or complaints, only Ocean's allegations of inappropriate touching by Appellant well over a year before.[142] Nevertheless, Ms. Williams took photographs during the course of her examination, which the authorization form acknowledged the collection of evidence might include. While Ms. Williams testified that the purpose of her examination was "to treat,"[143] she conceded that she did not expect to find anything she would need to treat, and as predicted, her physical examination of Ocean revealed no injuries or abnormal findings indicative of abuse. Per the authorization form, law enforcement then received a copy of the report, and the Government introduced the portion containing Ocean's statements and elicited Ms. Williams' testimony about them.

Under these circumstances, we find clearly erroneous and unsupported by the evidence the military judge's implicit finding that Ocean's statements to Ms. Williams were reasonably pertinent to medical diagnosis or treatment, as opposed to furthering a forensic medical examination in aid to law enforcement. Thus, applying the appropriate deference to her ruling, we find the

---

[138] Pros. Ex. 2 at 1; R. at 483–84, 489–92, 1064-66, 1069; App. Ex. VII at 31.

[139] R. at 499–501.

[140] Pros. Ex. 2 at 1.

[141] R. at 505–06, 515–16; Pros. Ex. 2 at 2.

[142] Pros. Ex. 2 at 2. *See also* section I.A.3, *supra*.

[143] R. at 537.

military judge abused her discretion in finding Ocean's statements to Ms. Williams "fit under the exception, [Mil. R. Evid.] 803(4)."[144]

### 2. Prejudice

Having found error, we test for prejudice. Contrary to Appellant's assertion, because both Ocean and Ms. Williams testified at trial and could be observed by the trier of fact, we conclude the reception of Ocean's out-of-court statements to Ms. Williams did not violate Appellant's confrontation right.[145] For non-constitutional evidentiary errors, the test for prejudice "is whether the error had a substantial influence on the findings."[146] In conducting this analysis, we weigh "(1) the strength of the Government's case, (2) the strength of the defense case, (3) the materiality of the evidence in question, and (4) the quality of the evidence in question."[147]

As discussed above, neither party's case was strong. The Government's rested almost entirely on Ocean's testimony and out-of-court statements, and the Defense's consisted principally of Appellant's denial of Ocean's allegations. However, the statements made to Ms. Williams, as testified to and memorialized in Prosecution Exhibit 2, are material to Specifications 3 and 6 of Charge I. And while the credibility of the statements is undermined by inconsistencies with Ocean's in-court testimony and other statements— particularly her unique claim to Ms. Williams that Appellant's alleged abusive acts happened "19 or 20 times"—we find the quality of the statements particularly important because they lend the imprimatur of medical testimony to delayed claims for which other forms of corroboration are lacking. Moreover, the trial counsel apparently shared this view, as the Government relied extensively on the statements contained in Prosecution Exhibit 2 during its closing argument.[148]

In weighing these factors, we conclude that the erroneous admission of Prosecution Exhibit 2 and Ms. Williams' testimony about Ocean's statements to her had a substantial influence on the guilty findings for Specifications 3

---

[144] R. at 494.

[145] *See Deland*, 22 M.J. at 72 (citations omitted).

[146] *Kohlbek*, 78 M.J. at 334 (internal quotation marks and citation omitted).

[147] *Id.* (quoting *Norman*, 74 M.J. at 150.

[148] *See* App. Ex. LXVI.

and 6 of Charge I.[149] Accordingly, we find prejudice to these findings and set them aside in our decretal paragraph.

### D. Cumulative Error

Finally, we address the doctrine of cumulative error, "under which a number of errors, no one perhaps sufficient to merit reversal, in combination necessitate the disapproval of a finding."[150] Here, "[w]e cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error[s]."[151] This was a contested case where Appellant consistently denied the allegations; there were no corroborating eyewitnesses for Ocean's allegations; the report was delayed and made under suggestive circumstances; the allegations made to authority figures changed over time and in significant ways that tend to undermine their credibility; and important information for assessing the credibility of the complaining witness was withheld from the trier of fact. We have found three errors and concluded that each caused sufficient prejudice to require setting aside one or more of Appellant's convictions. Even if we were to assume one or more of these errors did not require such action, we conclude that under the circumstances of this case, the confluence of the errors requires setting aside all of Appellant's convictions.

### III. CONCLUSION

The findings and sentence are **SET ASIDE.** The record is returned to the Judge Advocate General of the Navy. A rehearing is authorized.

Judges HOUTZ and MYERS concur.

---

[149] We conclude the error did not have a substantial influence on the guilty finding for Specification 2 of Charge I, as the statements Ocean made to Ms. Williams did not contain her later allegation that Appellant had put his mouth on her vaginal area.

[150] *United States v. Banks*, 36 M.J. 150, 170–71 (C.A.A.F. 1992) (quoting *United States v. Walters*, 4 C.M.A. 617, 635, 16 C.M.R. at 191, 209 (1954)); *see also United States v. Flores*, 69 M.J. 366, 373 (C.A.A.F. 2011) ("It is well established that an appellate court can order a rehearing based on the accumulation of errors not reversible individually.").

[151] *Banks*, 36 M.J. at 171 (quoting *United States v. Yerger*, 1 C.M.A. 288, 290, 3 C.M.R. at 22, 24 (1952)) (internal quotation marks omitted).

FOR THE COURT:

RODGER A. DREW, JR.
Clerk of Court